# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
May 29, 2013 Session Heard at Cookeville[1]

## STATE OF TENNESSEE v. KEVIN ANTHONY DICKSON, JR.

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Sevier County**
**No. 13010II      Richard R. Vance, Judge**

---

**No. E2010-01781-SC-R11-CD - Filed October 8, 2013**

---

The defendant, angry about the quality of the cocaine that he had purchased, procured weapons and ammunition and enlisted the assistance of two other men to help him confront the drug dealers and obtain a refund. After forcing his way into a cabin where the drug dealers were located, one of his compatriots—whom the defendant had armed with a .45 pistol—shot and seriously wounded two unarmed victims. Following a bench trial, the trial judge ruled that the defendant was criminally responsible for the actions of the shooter and found the defendant guilty of two counts of attempted first degree murder, and one count each of especially aggravated burglary, attempted aggravated robbery, and aggravated assault. The trial judge sentenced the defendant on these convictions, including consecutive twenty-five year sentences for each attempted first degree murder conviction. The Court of Criminal Appeals reduced one count of attempted first degree murder to attempted second degree murder, finding insufficient evidence of premeditation with respect to the shooting of one of the unarmed victims, and modified the conviction of especially aggravated burglary to aggravated burglary. The court affirmed the other convictions and remanded the case to the trial court for re-sentencing on attempted second degree murder and aggravated burglary. We accepted this case to review the sufficiency of the evidence supporting the convictions of attempted first degree murder and the propriety of the consecutive sentences for the attempted first degree murder convictions. We affirm both convictions for attempted first degree murder and the consecutive sentences.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed in Part and Reversed in Part**

---

[1] Oral argument was presented at Derryberry Hall on the campus of Tennessee Technological University in Cookeville, Putnam County, Tennessee, as a part of the Boys State Supreme Court Advancing Legal Education for Students (S.C.A.L.E.S.) project.

SHARON G. LEE, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and JANICE M. HOLDER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Renee W. Turner and John H. Bledsoe, Senior Counsel; James Dunn, District Attorney General; and Emilee Abbott, Assistant District Attorney General, for the appellant, State of Tennessee.

Rolfe A. Straussfogel, Sevierville, Tennessee, for the appellee, Kevin Anthony Dickson, Jr.

## OPINION

This case presents an all-too-familiar tale of drug-related violence. While at a bar in Gatlinburg on January 5, 2008, the Defendant asked Anthony Lyons if he could buy some ecstasy pills. Anthony Lyons agreed, so the Defendant followed Anthony Lyons to a cabin near Sevierville, close to where Anthony Lyons lived with his twin brother, Christopher Lyons, and their friend Christopher Gossett. After buying the ecstasy, the Defendant wanted to buy some cocaine. In the early morning hours of January 6, 2008, Gossett sold the Defendant the cocaine.

After snorting the cocaine with friends, the Defendant believed it was either not cocaine or of very poor quality. The Defendant became angry and made plans to confront Anthony Lyons and Gossett. The Defendant borrowed a .45 caliber handgun from a friend. He traveled to a local Wal-Mart store and purchased ammunition for the firearm. He then enlisted two men, Jessie James Davis[2] and Johnny Ramirez, to help him.

On the night of January 6, 2008, the three men, armed with weapons, went to the Lyons brothers' cabin. The Defendant carried a set of brass knuckles in one hand and a metal baton in the other. Ramirez was armed with the loaded .45 pistol procured by the Defendant. Davis wielded an air pistol. When the Defendant knocked on the door, Rodney Hardin, who had no connection to the drugs, moved to open the door. When the Defendant kicked open the door, Hardin immediately grabbed the Defendant and scuffled with him. Ramirez then shot Hardin. The Defendant continued into the cabin, shouting for his money and looking for Anthony Lyons and Gossett.

---

[2] The record is not consistent in the spelling of Davis' first name. It appears as both "Jessie" and "Jesse."

There were ten people in the cabin when the Defendant and his two compatriots arrived. After shooting Hardin, Ramirez next shot Christopher Lyons, who had fled from the front door to the cabin's interior stairs. As Anthony Lyons tried to escape into a bathroom, the Defendant caught up with him and beat him several times with the metal baton. The Defendant then raced upstairs looking for Gossett, but did not find him.[3] The armed trio fled the scene in a vehicle that the Defendant had parked near the cabin. Both of the shooting victims survived, but Hardin suffered debilitating injuries that left him partially paralyzed and Christopher Lyons suffered a serious leg injury.

Detective Matthew Cubberley of the Sevier County Sheriff's Department arrived at the cabin and interviewed Anthony Lyons and Gossett. Both men identified the Defendant as one of the perpetrators. Officers arrested the Defendant on January 7, 2008, and took him to the Sevier County Sheriff's Office where he gave a detailed statement about the home invasion and shooting. In his statement, the Defendant admitted that he and two other men went to the cabin to confront the drug dealers. The Defendant, explaining how mad he was when he found out that the cocaine was fake or of very poor quality, said: "I really felt like I really got played." He admitted that he "beat the shit out" of Anthony Lyons. He said that two people got shot "because of their two friends being shysters."

In March 2008, the Sevier County grand jury indicted the Defendant on two counts of attempted first degree murder, two counts of aggravated assault, one count of especially aggravated burglary, and one count of attempted especially aggravated robbery.[4] He waived his right to a jury trial and was tried on March 18, 2009.

At trial, the State presented the testimony of eight witnesses: Rodney Hardin, Christopher Lyons, Anthony Lyons, Matthew Cubberley, Jeff McCarter, Leslie Franklin, Laura Patrick, and Levi Morton. Hardin testified that he went to the cabin to place a bet on a football game with Christopher Lyons. He heard someone knocking on the door and went to open it. As he twisted the doorknob, someone kicked in the door. Hardin instinctively grabbed the Defendant, and they scuffled briefly before one of the intruders shot Hardin. Hardin said the intruders were asking, "where's the money, where's the drugs?" He also recalled that one of the intruders stood over him with a gun and "told me he was going to fill me full of holes." Hardin sustained injuries to his spleen, kidneys, and spinal cord.

---

[3] Christopher Lyons testified that Gossett hid upstairs under some clothes.

[4] The State later filed a motion asking the trial court to change the count of attempted especially aggravated robbery to attempted aggravated robbery.

Christopher Lyons testified that he partied with the Defendant on New Year's Eve 2007, recalling "we had a great night." Both he and the Defendant consumed cocaine and ecstasy at the New Year's Eve party. Ramirez also attended the party. The next time Christopher Lyons saw the Defendant was on the evening of January 6, 2008, when the Defendant came "busting" in the cabin door swinging at Hardin with a police baton and brass knuckles. Christopher Lyons heard two shots and saw Hardin go down. The Defendant and Davis demanded to know where the money and drugs were located and said they were going to "start executing people." Christopher Lyons saw the Defendant chase after his brother, Anthony Lyons, swinging a police baton. Christopher Lyons ran away from the cabin door to try to run up the stairs. He saw Ramirez staring at him, aiming the gun at his chest and face area. Ramirez then shot him in the right inner thigh area. As a result of the shooting, Christopher Lyons has a steel rod from his hip to his knee, two screws in his knee, and a screw in his hip.

Anthony Lyons testified that on the night before the shooting, he met the Defendant at a Gatlinburg bar where the Defendant asked about buying ecstasy pills. Anthony Lyons agreed to sell him the drugs, so the Defendant followed him to a cabin near the Lyons' cabin. The Defendant purchased some ecstasy pills from Anthony Lyons and Gossett. After the Defendant bought the ecstasy, he wanted to buy some cocaine. Gossett agreed to sell him some, but the Defendant and Gossett argued over the quantity and price of the cocaine. After some haggling, Gossett and the Defendant agreed on a price of $300 for the cocaine. The drug transaction occurred around 2:30 a.m. or 3:00 a.m. on January 6, 2008.

Anthony Lyons then testified that later in the evening, he heard a knock at the door, and then "somebody c[ame] busting in the door." He saw Hardin grab the Defendant, and they struggled with each other. Anthony Lyons then testified that he heard a "pop, pop, pop" sound and noticed that Hardin "went down to the ground." The Defendant then entered the cabin armed with a baton and brass knuckles and demanded money and drugs. To avoid the gunfire, Anthony Lyons fled to a bathroom, where two other individuals were hiding. The Defendant chased after him, at which point Anthony Lyons heard the Defendant say: "[I]f they don't come out they're dead." The Defendant then swung at Anthony Lyons with the baton and hit him "probably about fifteen times." The Defendant also hit him five times with the brass knuckles. Shortly thereafter, Anthony Lyons and his female companion escaped through the bathroom window.

Detective Cubberley testified that he arrived on the scene with Captain McCarter and interviewed Anthony Lyons and Gossett, who identified the Defendant as the perpetrator. Detective Cubberley processed the crime scene and collected several .45 caliber shell casings.

Captain McCarter testified that he and another detective interviewed the Defendant after he was taken to the jail. The Defendant gave a lengthy statement, an audio recording of which was played at the trial. In his statement, the Defendant said that he had no intentions of hurting anyone but just wanted to "scaree [sic] that dude." The Defendant said he became extremely upset after he and his friends realized, after trying the cocaine, that the substance was not really cocaine. He immediately thought of going to the cabin, stating, "I was actually going to go over there by myself, but if I would have went over there by myself, I'll be honest with you all, wouldn't nobody have been alive in that house." The Defendant parked a vehicle at the bottom of the hill, and he, Davis, and Ramirez made their way up the hill to the Lyons' cabin. The Defendant told Ramirez to simply shoot the gun in the air to let the people in the cabin know they meant business. Later he said: "I may sound bold but I'm glad . . . that they got shot, they wasn't supposed to be, got shot, but that's the only thing that helps me move on today because I didn't get my money back." The Defendant believed that he was the victim in the chain of events, because Anthony Lyons and Gossett had wronged him. The Defendant acknowledged he knew that his compatriots—he would not name them to his questioners—were armed. He later said that if the two people had not come with him, "I'm telling you I would have shot everybody in that house." He admitted that he bought ammunition for the gun from Wal-Mart.

Officer Franklin, who works patrol with the Sevier County Sheriff's Department, testified she was called to the scene after the shooting. Upon her arrival, she observed the "hectic scene," saw victims with serious injuries, and someone, later identified as Anthony Lyons, lying on the ground outside the cabin.

Ms. Patrick, an asset protection coordinator with Wal-Mart, testified that on January 6, 2008, a person with a birth date of November 9, 1981, purchased .45 caliber ammunition with cash at 8:08:55 p.m. Other evidence indicated that the Defendant's date of birth was November 9, 1981.

Mr. Morton, who worked in the Sevier County Jail, testified that while being booked, the Defendant said that "he wasn't a snitch and that the guy got what he deserved for selling him bad drugs and he didn't care if he was paralyzed or what happened to him."

At the close of the State's proof, the trial judge denied the Defendant's motion for acquittal on the charges of attempted murder and attempted aggravated robbery.

The Defendant testified on his own behalf. He claimed there was "no plan" to shoot anyone. "I mean, there was no plan, I was just going to confront him about the fake dope he sold me and see if I could get my money back," he testified. He contended he did not threaten to kill anyone, but asked for his money, saying, "I want my F-ing money back." He

claimed that he asked some friends to go with him so he would not get "jumped" when he went to a home containing drug dealers. He said there were no discussions about killing or shooting. Ramirez had the .45 caliber pistol and Davis had an air pistol. He said the guns were there simply "for protection." During direct examination, the Defendant's attorney asked him about his inflammatory statement: "If I was going over there by myself I'll be honest with you all, wouldn't nobody be alive in that house." The Defendant testified that this was "just exaggeration." He also admitted hitting Anthony Lyons with the baton, but denied hitting him with the brass knuckles. He admitted handing the pistol to Ramirez, telling him "to hold it for me." He also acknowledged purchasing ammunition for the pistol from Wal-Mart.

After hearing the evidence, the trial judge found that the Defendant "had planned the event, that he was acting out of revenge and anger." He also determined that the Defendant was "criminally responsible for the conduct of Ramirez, as it was [the Defendant] who had solicited, directed, and aided Ramirez in committing these offenses with the firearm." He ruled that the proof showed beyond a reasonable doubt that the Defendant had the "requisite intent to kill" based on the "preparations, his conduct, the providing of the weapons, purchasing ammunition, the statements and expressions to kill and execute the victims made during the commission of the offense." The trial judge convicted the Defendant of two counts of attempted first degree murder, one count of aggravated assault,[5] one count of especially aggravated burglary, and one count of attempted aggravated robbery.

The Defendant's sentencing hearing was held on June 29, 2009. The State presented the testimony of Hardin, Christopher Lyons, and Anthony Lyons. The wheelchair-bound Hardin explained that he had worked as an electrician before the shooting, but that the shooting had radically changed his life. He testified that, as a result of the injuries suffered from the shooting, he cannot work and support his family. He fell into deep depression and testified that he did not know if he will ever be able to walk again. He lamented that he was not able to do the things he formerly was able to do to care for his family, including his three children. Christopher Lyons also testified that the shooting changed his life dramatically: "My whole life, I'll never do some things that I'd done before that day. You know, I'll have pain my whole life that I would never have experienced if it wasn't for that day." He explained that before the shooting he had worked as a waiter, but he can no longer wait tables. He testified that after the shooting, it was more difficult for him to pay child

---

[5] The Defendant was convicted of two counts of aggravated assault, but the trial court merged the aggravated assault conviction with the attempted murder charge for the Defendant's conduct against Hardin.

support.[6] He also said that he continues to suffer "agonizing pain" in his leg. Anthony Lyons testified that the Defendant's violent attack on him has caused him to suffer post-traumatic stress disorder, stating: "That was the most traumatic event . . . of my life by far." He also testified that he continues to suffer from sleeplessness, anxiety, and depression since the violent attack.

The defense presented the testimony of Laurisa Dugger-Barnette, Susan Dugger-McCarrge, and the Defendant. Laurisa Dugger-Barnette, the Defendant's fiancée, testified that she and the Defendant have a young child together who was born while the Defendant was in jail for these offenses. She explained that without the Defendant's financial support, it was much more difficult for her to provide support for their child. According to her, the Defendant was not a violent person. Susan Dugger-McCarrge, the aunt of Laurisa Dugger-Barnette, testified that the Defendant was "[t]ruly a phenomenal person" who "made a mistake." The Defendant testified that he never intended for anyone to get hurt, and that if he could change things, "I just wouldn't never been doing no drugs." The Defendant expressed remorse at the sentencing hearing, apologizing to the victims and asking for their forgiveness.

The trial court found the State had proven four enhancement factors under Tenn. Code Ann. § 40-35-114 (2010 & Supp. 2012): that the Defendant had a previous criminal history, Tenn. Code Ann. § 40-35-114(1); that the Defendant was the leader in the commission of the offense with two or more criminal actors, Tenn. Code Ann. § 40-35-114(2); that the personal injuries inflicted on the victims were severe, Tenn. Code Ann. § 40-35-114(6); and that the Defendant possessed deadly weapons during the commission of an offense, Tenn. Code Ann. § 40-35-114(9). The judge also found one mitigating factor under Tenn. Code Ann. § 40-35-113 (2010), because the Defendant was "genuinely remorseful and apologetic."

The judge imposed a twenty-five-year sentence for each attempted first degree murder conviction. He also determined under Tenn. Code Ann. § 40-35-115 (2010) that the sentences for attempted first degree murder should run consecutively rather than concurrently, because the Defendant had an extensive criminal record under Tenn. Code Ann. § 40-35-115(b)(2) and was a dangerous offender who showed little regard for human life under Tenn. Code Ann. § 40-35-115(b)(4). The judge then imposed a six-year sentence for the remaining aggravated assault conviction, a twelve-year sentence for the especially aggravated burglary conviction, and a six-year sentence for the attempted aggravated robbery conviction, all to be served concurrently with the two twenty-five-year sentences, for a total effective sentence of fifty years.

---

[6] At the time of the sentencing, Christopher Lyons testified he was in jail for failure to pay child support.

The Defendant appealed to the Court of Criminal Appeals, which affirmed the attempted first degree murder conviction as to the shooting of Christopher Lyons, but reduced the attempted first degree murder conviction as to the shooting of Hardin to attempted second degree murder. *State v. Dickson*, No. E2010-01781-CCA-R3-CD, 2012 WL 2152078, at *10 (Tenn. Crim. App. June 14, 2012). The Court of Criminal Appeals found that there was insufficient evidence that Ramirez, the shooter, acted with premeditation in firing upon Hardin, noting that Ramirez "immediately shot Mr. Hardin." *Id.* Judge John Everett Williams dissented in part, noting that "a rational juror could have inferred that Mr. Ramirez formed the intent to shoot and kill Mr. Hardin in furtherance of their plan to seek retribution against Mr. Lyons." *Id.* at *17 (Williams, J., concurring in part and dissenting in part). The appeals court also modified the conviction of especially aggravated burglary to aggravated burglary. *Id.* at *11 (majority opinion). The Court of Criminal Appeals affirmed the trial court's finding of consecutive sentencing based on the Defendant's "extensive record of criminal activity." *Id.* at *15.

Both the Defendant and the State appealed to this Court.[7] We granted review to examine whether there is sufficient evidence to support the Defendant's convictions for attempted first degree murder, and if so, whether consecutive sentencing for the attempted first degree murder convictions was proper.

**II.**

When reviewing a challenge to a conviction based on the sufficiency of the evidence, a court "must determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In making this determination, the prosecution receives "the strongest legitimate view of the evidence . . . as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Davis*, 354 S.W.3d 718, 726 (Tenn. 2011) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). A verdict of guilt removes the presumption of innocence and creates a presumption of guilt. The Defendant bears the burden of showing the evidence was insufficient to sustain the guilty verdict. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "This Court does not reweigh or reevaluate the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)).

---

[7] The Defendant challenged the attempted first degree murder conviction for the shooting of Christopher Lyons and the imposition of consecutive sentencing. The State challenged the reduction of the attempted first degree murder conviction for the shooting of Hardin to attempted second degree murder.

Our review of the Defendant's convictions for attempted first degree murder is three-fold: (1) whether the Defendant was criminally responsible for the acts of Ramirez because the Defendant promoted or assisted in the commission of the offense, or benefitted in the proceeds or results of the offense under Tenn. Code Ann. § 39-11-402(2); (2) whether Ramirez intended to kill Hardin and Christopher Lyons and took a "substantial step" toward the offense for purposes of the criminal attempt statute, Tenn. Code Ann. § 39-12-101(a)(3) (2010); and, if so, (3) whether Ramirez acted with sufficient premeditation in his attempts to kill Hardin and Christopher Lyons within the meaning of Tenn. Code Ann. § 39-13-202(a)(1) (2010).

The Defendant can be criminally responsible for the offenses committed by Ramirez if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [Defendant] solicit[ed], direct[ed], aid[ed], or attempt[ed] to aid [Ramirez] to commit the offense." Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime, but "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Criminal responsibility represents a legislative codification of the common law theories of aiding and abetting and accessories before the fact. *Id*. at 171 (citing *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997)). "No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible." *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Criminal responsibility "requires that a defendant act with a culpable mental state, [i.e.], the 'intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" *Carson*, 950 S.W.2d at 954 (quoting Tenn. Code Ann. § 39-11-402(2) (1991)). "A person acts with intent as to the nature or result of conduct when it is that person's conscious objective or desire to engage in the conduct or cause the result." *Id*.

The Defendant and Ramirez set out to commit an armed intrusion into the Lyons' cabin to obtain money and drugs. The Defendant was angry about the cocaine he purchased and he wanted his money back. He planned to go to the cabin and confront the drug dealers whom he thought had cheated him. He solicited the help of Davis and Ramirez to accompany him because he did not want to go alone. The Defendant borrowed a .45 caliber pistol from a friend, purchased ammunition for the gun two hours before the shootings, and then armed Ramirez with it. The Defendant armed himself with a baton and brass knuckles. Davis was armed with an air pistol. The Defendant then drove the vehicle, carrying Ramirez and Davis, to confront Anthony Lyons and Gossett. He parked at the bottom of a hill, and they walked up to the cabin where Gossett and Anthony Lyons resided. After the Defendant forced his way into the cabin, Ramirez shot two unarmed victims. The Defendant solicited Ramirez's aid in the home invasion to confront the drug

dealers and obtain money and drugs, and the Defendant benefitted from Ramirez's assistance. A natural and probable consequence of this attempt to obtain money and drugs by force was the shooting of two unarmed victims.[8] Thus, there was sufficient evidence to support a finding that the Defendant was criminally responsible for the acts of Ramirez based on Tenn. Code Ann. § 39-11-402(2).

The next issue is whether Ramirez intended to kill Hardin and Christopher Lyons, and whether Ramirez took a "substantial step" toward such criminal action within the meaning of the criminal attempt statute. Criminal attempt occurs when a person acts with the kind of culpability otherwise required for the attempted offense and:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

This case concerns subsection (a)(3): whether Ramirez acted with the intent to complete a course of action that would constitute the criminal offense, and whether his conduct constituted a "substantial step toward the commission of the offense." Ramirez accepted a loaded pistol from the Defendant before he went to the Lyons' cabin to confront the drug dealers. Ramirez also shot two unarmed victims after the Defendant "busted" through the front door. The record reflects that Ramirez shot Christopher Lyons after staring

---

[8] The "natural and probable consequences" rule is a common law concept that is frequently asserted in criminal responsibility cases tried before a jury. The rule "extends the scope of criminal liability to the target crime intended by a defendant as well as to other crimes committed by a confederate that were the natural and probable consequences of the commission of the original crime." *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000). The attempted first degree murder offenses were natural and probable consequences of the target crimes of aggravated burglary and attempted robbery.

directly at his face and chest area. Ramirez also took a "substantial step" toward the offense of attempted first degree murder. We have explained:

> We hold that when an actor possesses materials to be used in the commission of a crime, at or near the scene of the crime, and where the possession of those materials can serve no lawful purpose of the actor under the circumstances, the jury is entitled, but not required, to find that the actor has taken a "substantial step" toward the commission of the crime if such action is strongly corroborative of the actor's overall criminal purpose.

*State v. Reeves*, 916 S.W.2d 909, 914 (Tenn. 1996). "[T]he question of whether a defendant has taken a substantial step toward the commission of a crime sufficient to support a conviction for criminal attempt is necessarily a heavily fact-intensive inquiry determined by the specific circumstances shown in each individual case." *Davis*, 354 S.W.3d at 733. The facts show that Ramirez came to the cabin late at night with a loaded handgun intent on an armed invasion. He then shot two unarmed victims shortly after the Defendant burst through the front door of the cabin. Because Ramirez's action in carrying a loaded handgun and twice firing it at two unarmed victims was "corroborative of [his] overall criminal purpose," the trial judge was entitled to find, considering all the circumstantial evidence, that Ramirez took a "substantial step" toward committing the crime of attempted first degree murder.

The next issue is whether there is sufficient evidence that Ramirez acted with premeditation when he fired upon the two victims. Because Ramirez was the shooter, we focus on Ramirez's conduct to determine whether there is sufficient evidence of premeditation to support the Defendant's conviction for attempted first degree murder.[9] *See Howard*, 30 S.W.3d at 275-76 (recognizing that in a first degree murder case, because the defendant was not accused of firing the weapon that killed the victim, the State had to prove that the defendant was criminally responsible for premeditated murder based upon the conduct of the shooter).

First degree murder includes the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010). Premeditation is "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The intent to kill must be formed before the perpetrator commits the act, but "[i]t is not necessary that the

---

[9] In considering premeditation, the trial court erred by focusing on the conduct of the Defendant rather than Ramirez. The trial judge, however, reached the correct result, because there was sufficient evidence to show that Ramirez acted with premeditation. In reviewing a conviction based on the sufficiency of the evidence, we do not focus on the trial judge's conclusions, but on whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id*. Premeditation is a question of fact for the rational fact-finder to determine after considering all the evidence. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Premeditation may also be inferred from circumstantial evidence surrounding the crime. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Circumstances that may support a finding of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *Brown*, 836 S.W.2d at 541-42; *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)).

After taking the strongest legitimate view of the evidence in favor of the State, we hold that sufficient evidence existed that Ramirez acted with premeditation in shooting Hardin. First, Ramirez accepted a loaded pistol from the Defendant before going to the cabin. A reasonable fact-finder could determine that this showed planning on the part of the shooter to use the weapon against the cabin occupants. Second, Ramirez used a deadly weapon on the unarmed Hardin. Premeditation can be inferred from both of these circumstances. *Bland*, 958 S.W.2d at 660.

Sufficient evidence also existed to support a finding that Ramirez acted with premeditation in shooting Christopher Lyons. First, Ramirez went to the cabin with a loaded gun. Second, Christopher Lyons was an unarmed victim. Third, Ramirez shot Christopher Lyons as he was attempting to flee, after pausing to look directly at him while pointing the pistol at him. Under *Bland*, shooting a retreating victim alone provides circumstantial evidence of premeditation. *Id*.

In reducing the attempted first degree murder conviction for the shooting of Hardin to attempted second degree murder, but affirming the attempted first degree murder conviction for the shooting of Christopher Lyons, the Court of Criminal Appeals identified a key difference between the two shootings: that Ramirez shot Hardin almost immediately, but shot Christopher Lyons as he was fleeing. *See Dickson*, 2012 WL 2152078, at *10. However, we agree with the dissenting judge that a rational fact-finder could have inferred from the evidence that Ramirez had formed the intent to shoot and kill Hardin to further the Defendant's plan of seeking retribution against Anthony Lyons. The fact-finder could infer that "premeditation could have existed in Ramirez's mind prior to their arrival at the home." *Id.* at *17 (Williams, J., concurring in part and dissenting in part). Ramirez shot Hardin after seeing Hardin grab the Defendant. A rational fact-finder could infer from these circumstances that Ramirez intentionally fired the gun at Hardin to help the Defendant carry out his plan. Although the Defendant testified that it was not his idea to bring the gun, the Defendant readily admitted that he acquired the gun and ammunition and that he provided

the loaded weapon to Ramirez.[10] Arming oneself before proceeding to someone's home is evidence of planning. Ramirez willingly accepted a loaded pistol from the Defendant and then used deadly force against two unarmed victims.

The Defendant argues that the application of the criminal responsibility theory in an attempted first degree murder case conflicts with Tennessee law prohibiting the offense of "attempted felony-murder." *See State v. Kimbrough*, 924 S.W.2d 888, 892 (Tenn. 1996) (holding that "the offense of attempted felony murder does not exist in Tennessee"). The Defendant contends that "[t]here would seem to be little distinction between hypothetical criminal liability for attempted felony murder and being criminally responsible for attempted first degree murder under the natural and probable consequences doctrine." However, in the wake of *Kimbrough*, Tennessee courts have distinguished between the crime of attempted felony murder and the crime of attempted first degree murder, which requires premeditation. *See Oliver v. Mills*, No. W2007-00518-CCA-R3-HC, 2007 WL 2471478, at *2 (Tenn. Crim. App. Aug. 30, 2007) ("While *State v. Kimbrough* nullified the offense of criminal attempt to commit first degree felony [murder], the offense of criminal attempt to commit first degree murder (premeditated) remains a valid offense in Tennessee." (citation omitted)); *Twitty v. Carlton*, No. 03C01-9707-CR-00310, 1999 WL 2832, at *2 (Tenn. Crim. App. Jan. 6, 1999) ("Petitioner's reliance on *State v. Kimbrough* to attack his indictment for attempted first degree murder is misplaced. The *Kimbrough* case dealt with a conviction for attempt to commit felony murder, not an attempt to commit premeditated first degree murder." (citation omitted)); *State v. Fernandez*, No. 01C01-9609-CR-00394, 1998 WL 10879, at *8 (Tenn. Crim. App. Jan. 14, 1998) ("The supreme court in *Kimbrough* held that there is not an offense of *attempted felony murder* as one cannot intend to accomplish the unintended. *Kimbrough* is distinguished from this case as Defendant was convicted of *attempted premeditated first degree murder*. . . ." (second emphasis added)). Attempted felony murder is not a recognizable criminal offense, but attempted premeditated first degree murder is a cognizable offense. There is nothing inherently suspect about an attempted first degree murder conviction based upon the theory of criminal responsibility.

## III.

The next issue is whether the trial court erred in imposing consecutive – rather than concurrent – sentences for the attempted first degree murder convictions. When reviewing sentences, an appellate court must "conduct a de novo review on the record of the issues." Tenn. Code Ann. § 40-35-401(d) (2010). The statute also provides that the appellate court's review "shall be conducted with a presumption that the determinations

---

[10] The Defendant testified: "It wasn't my idea to get like a real gun and it wasn't my idea to get a fake gun. It was suggestions that was made to me and I felt like well, okay."

made by the court from which the appeal is taken are correct." *Id*. In *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012), this Court determined that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'"[11]

The Defendant has the burden of challenging the sentencing decision by the trial court. *State v. Wilkerson*, 905 S.W.2d 933, 934 (Tenn. 1995); *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). Criminal defendants convicted of multiple offenses may be sentenced concurrently or consecutively. Tenn. Code Ann. § 40-35-115 (2010). The statute provides that a trial court may impose consecutive sentencing if the court finds by a preponderance of the evidence that certain statutory factors are present. Only one factor is necessary for consecutive sentencing. *State v. Mickens*, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

The trial judge found that two of the statutory factors applied: that the Defendant had an extensive record of criminal activity under Tenn. Code Ann. § 40-35-115(b)(2), and that he was a "dangerous offender" under Tenn. Code Ann. § 40-35-115(b)(4). Because of these two factors, the trial judge reasoned that the sentences should run consecutively "in order to protect the community." The Court of Criminal Appeals affirmed the trial court's finding of consecutive sentencing based on his extensive record of criminal activity under Tenn. Code Ann. § 40-35-115(b)(2).

Tenn. Code Ann. § 40-35-115(b)(2) applies to the Defendant. The Defendant had numerous prior convictions. While many of these convictions did not involve acts of violence and most constituted driving offenses, they indicate a consistent pattern of operating outside the confines of lawful behavior.[12] Trial courts can consider prior misdemeanors in determining whether a defendant has an extensive record of criminal activity. Tenn. Code Ann. § 40-35-115(b)(2) does not distinguish between felonies and misdemeanors. *See State*

---

[11] This Court has not yet addressed whether this deferential standard of review applies to a trial court's determination of consecutive or concurrent sentencing. However, the Court has granted review in *State v. Pollard*, No. M2011-00332-CCA-R3-CD, 2012 WL 4142253 (Tenn. Crim. App. Sept. 17, 2012), *perm. app. granted* (Tenn. Feb. 13, 2013), which presents the issue of whether the abuse of discretion standard in *Bise* applies to consecutive sentencing determinations.

[12] The Defendant's Criminal History Report prepared for the trial court shows numerous arrests dating back to 1999, when the Defendant was a juvenile living in Michigan. The report shows convictions for driving on a suspended license, carrying a prohibited weapon (brass knuckles), uttering and publishing (a type of forgery crime in Michigan), and manufacture of drugs. The Defendant pled guilty to manufacturing marijuana in 1999. The Defendant faced a charge for "felony dangerous drugs" in 2005. The report is unclear as to the disposition of the 2005 drug charge.

*v. Neu*, No. W2007-02166-CCA-R3-CD, 2008 WL 2510588, at *3 (Tenn. Crim. App. June 24, 2008); *State v. Arias*, No. E2005-01700-CCA-R3-CD, 2006 WL 2277667, at *22 (Tenn. Crim. App. Aug. 9, 2006). Consecutive sentencing based on an offender's extensive record of criminal activity is appropriate to protect society from those who "resort to criminal activity in furtherance of their anti-societal lifestyle." *Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976). On April 21, 2007, during a search incident to a lawful arrest for driving without a license, the officer found a pair of brass knuckles in the Defendant's left-front pocket. The trial judge found this to be particularly important and noted during sentencing that this incident indicated the Defendant's "propensity toward use of deadly weapons or dangerous weapons."[13]

The Defendant contends that as a young man still in his twenties, he is an excellent candidate for rehabilitation. However, he consistently acted outside the confines of the law and engaged in a violent course of action that nearly led to the loss of two lives. While rehabilitation is a laudable goal of the criminal justice system, violent offenders must be held accountable for their unlawful actions. Thus, the trial court's imposition of consecutive sentencing was proper under either an abuse of discretion or a de novo standard of review.

We determine that there was sufficient evidence to support the conviction of the Defendant on two counts of attempted first degree murder. We reverse the Court of Criminal Appeals to the extent that it reduced one of the Defendant's attempted first degree murder convictions to attempted second degree murder. We further hold that the trial judge did not err in imposing consecutive sentencing for those two attempted first degree murder convictions. The judgment of the Court of Criminal Appeals is affirmed in all other respects. Because the Defendant, Kevin Anthony Dickson, Jr., is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
SHARON G. LEE, JUSTICE

---

[13] The Defendant's Criminal History Report indicates that he pled guilty to carrying the prohibited weapon (brass knuckles). The report further indicates that the sentence was "suspended on forfeiture of weapon."