# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
January 7, 2014 Session

## STATE OF TENNESSEE v. JOEY GODWIN

**Appeal from the Circuit Court for Gibson County**
**Nos. 9061 & 9088      Clayburn Peeples, Judge**

---

**No. W2013-01602-CCA-R3-CD  - Filed March 6, 2014**

---

Appellant, Joey Godwin, was convicted of two counts of the sale of more than 0.5 grams of cocaine, a Schedule II controlled substance, for which he received consecutive sentences of thirty years each.  He appeals his convictions and sentences on the following grounds: (1) the evidence underlying the convictions was insufficient to establish his guilt beyond a reasonable doubt; (2) the trial court erred by imposing consecutive sentences; and (3) the trial court erred in finding that the State did not improperly exercise some of its peremptory challenges during jury selection.  We affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. D. KELLY THOMAS, JR., J., filed a separate, dissenting opinion.

Tom W. Crider, District Public Defender; J. Daniel Rogers (on appeal), and Linda L. Moore (at trial), Assistant District Public Defenders, Trenton, Tennessee, for the appellant, Joey Godwin.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Garry G. Brown, District Attorney General; and Larry Hardister and Jason C. Scott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Facts

This case involves an undercover operation by the Humboldt Police Department's Drug Task Force wherein appellant sold cocaine in an amount greater than 0.5 grams to a confidential source on two separate occasions.  For his involvement in these offenses, a grand

jury indicted appellant for two counts each of the sale of a Schedule II substance and delivery of the same. *See* Tenn. Code Ann. §§ 39-17-408(b)(4), -417(a)(2), (a)(3), (c)(1).

## A. Trial

The State's first witness was Lieutenant Danny Lewis, who was an assistant special agent with the Drug Task Force of the Humboldt Police Department. In 2010, the task force conducted a seven-month-long operation targeting drug trafficking in public housing in the area. As part of this operation, the task force recruited a confidential informant ("CI")[1] who had experience in working undercover. Lieutenant Lewis stated that they placed the CI in public housing as a resident and allowed him time to make contacts in the area. After the CI made the necessary contacts, he began meeting with the task force to conduct controlled buys of illegal drugs. Protocol required that an officer first search the CI's vehicle and person to ensure that he had no drugs or money in his possession. The CI would place a telephone call to arrange to purchase drugs. Officers would next equip him with a video camera worn on his body, as well as an audio transmitter in his vehicle. Lieutenant Lewis explained that when the CI conducted the drug purchases, officers were located nearby to intervene if problems arose. Following the completion of the transactions, officers would meet with the CI to retrieve the evidence and to search him and his vehicle again. Lieutenant Lewis acknowledged that the CI was a paid confidential source; however, he was paid for each transaction without regard to whether the task force could build a case against the subject or whether the State secured a conviction against the subject, thus removing any incentive to "set somebody up."

Lieutenant Lewis recalled that with regard to the first transaction involving appellant on September 30, 2010, the operation followed protocol. The CI placed a telephone call to appellant and arranged to purchase drugs from him at the Fort Hill public housing complex. Lieutenant Lewis identified appellant from the videotape, and the tape also captured appellant's vehicle, which the task force was able to confirm by matching the license numbers with public records. Upon completion of the transaction, the CI returned with the evidence. Lieutenant Lewis field tested the substance, and it tested positive for cocaine. The Tennessee Bureau of Investigation's ("TBI") crime laboratory confirmed that the substance was, indeed, 0.86 grams of cocaine base. The CI subsequently identified appellant through the use of a photograph array.

Lieutenant Lewis stated that the same procedure was followed on November 22, 2010, when the CI again purchased drugs from appellant. They agreed to meet at Westside Grocery to complete the transaction. Appellant arrived in a different car, and he did not roll down the

---

[1] To maintain the confidentiality of this police source, we will refer to him as the "CI."

car's window fully, which created a glare on the video recording. Lieutenant Lewis explained that although the driver's identity is not readily apparent, the voice on the recording was similar to appellant's voice as recorded during the first transaction. Following the same procedure, the CI returned with the evidence, which was field tested and confirmed by the TBI as being 0.7 grams of cocaine base.

On cross-examination, Lieutenant Lewis admitted that the CI was provided housing by the public housing authority at no expense to him and that utility bills were likely included in the "package." He also expounded on the CI's credibility, stating that although the CI had garnered some criminal convictions, they were far removed in time and were outweighed by the experience that he had received in working with other agencies such as the Bureau of Alcohol, Tobacco, and Firearms, the Drug Enforcement Agency ("DEA"), and other drug task forces in Tennessee and surrounding states. In short, Lieutenant Lewis stated, the CI came "highly recommended . . . as doing good work and being able to handle himself . . . ." He had experienced no difficulty or problems with the CI with regard to honesty or truthfulness.

The CI testified next and stated that he had worked with the drug task force on a "by the buy" basis, meaning that he would be compensated $50 for any purchase of marijuana and $100 for any purchase of "narcotics, pills, [or] cocaine." Payment was not predicated upon securing a conviction. The CI had been working with law enforcement agencies for eighteen to twenty years at the time of the transactions and had assisted the DEA, the Federal Bureau of Investigation, "[a]ll of Tennessee, every branch of the government, . . . local task forces[,] Atlanta, California, South Carolina, North Carolina, Virginia, Alabama[,] [and] Mexico, the border."

The CI noted that before the day he first purchased drugs from appellant, he had "a couple" of contacts with him, and during one of the contacts, the CI obtained appellant's telephone number. The CI told appellant that he would need some "hard," meaning the rock form of cocaine, and appellant furnished his telephone number and instructed the CI to call when he was ready. On the date of the first drug transaction, the CI met with Investigator Lewis, and task force officers "wired" the CI and his truck. They also searched him and his truck. They instructed the CI to place a telephone call to appellant, and the CI drove to the designated meeting place. Appellant exited the apartment, approached the CI, and delivered the cocaine to him. The CI stated that he then returned to Officer Lewis and turned over the evidence to him.

The CI explained that the subsequent transaction in November 2010 followed the same protocol. After he placed the telephone call to appellant, the CI began to drive toward the meeting place, which was Westside Grocery. Appellant parked his vehicle, and the CI

exited his vehicle and walked to the driver's side of appellant's vehicle. Appellant never exited his vehicle. The CI confirmed that he purchased cocaine that day from appellant and delivered it to Lieutenant Lewis.

On cross-examination, the CI admitted to felony convictions for stealing livestock and for passing a forged check. He acknowledged that during the six-month time frame in which he worked with the drug task force, he did not have any other source of employment and that he supported his girlfriend and his daughter. However, his girlfriend received social security benefits. The CI could not state with certainty the total amount of his compensation for his work with the task force. He agreed that he was provided a place to live and all necessary utilities. However, he explained that he paid for other items, such as cable television, grocery bills, cellular telephone service, clothing, and automotive expenses. The CI testified that he had used between fifty and one hundred aliases during his career and that his alias at that time was "Tennessee."

The CI further indicated that during the second transaction, appellant instructed him to meet at "the Crossing." However, when the CI arrived there, appellant was not present. The CI contacted appellant and received directions to the location where they were to meet. The CI testified, "[H]e was moving around like roaches." The CI also stated that he was working with other drug task forces during the same period.

On redirect examination, the CI explained that his conviction for "cattle rustling" was twenty years old and his conviction for passing a forged check was sixteen to eighteen years old. At the close of the CI's testimony, the State rested its case, and appellant presented no proof. Following deliberations, the jury found appellant guilty of two counts of the sale of more than 0.5 grams of cocaine.

B. Sentencing Hearing

At the sentencing hearing, the State advanced that appellant should be sentenced as a career offender, and appellant did not contest that position. The trial court imposed sentences of thirty years for each conviction, and the State requested that they be served consecutively based on appellant's extensive criminal record and his being on parole at the time the offenses were committed. Appellant asserted that as a mitigating factor, the trial court should consider that the offenses neither caused nor threatened serious bodily injury and asked that the sentences be served concurrently.

Based on appellant's status as a parolee when the offenses were committed and upon his having "a great deal more than enough of a prior record to classify him as a career offender," the trial court ordered that appellant serve his sentences consecutively to each

other and consecutively to the offense for which he was on parole. The trial court noted that appellant took no responsibility for his actions and that based on his criminal behavior, he constituted a "danger to the order and well[-]being of society."

## II. Analysis

Appellant raises three issues for our review: (1) whether the evidence was sufficient to support his convictions; (2) whether the trial court erred in ordering consecutive sentence alignment; and (3) whether the trial court erred in finding that the State did not improperly exercise some of its peremptory challenges during voir dire.

## A. Sufficiency of the Evidence

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must

demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Appellant was convicted of two counts of the sale of a Schedule II controlled substance — 0.5 grams or more of cocaine — on two different dates. *See* Tenn. Code Ann. §§ 39-17-407(b)(4), -417(a)(3), (c)(1). Thus, for each offense date, the State must have presented sufficient evidence to establish appellant's guilt beyond a reasonable doubt.

In an attempt to combat drug sales in public housing in the area, officers with the Humboldt Police Department's drug task force worked in conjunction with a confidential source whom they placed in housing for the purpose of facilitating contact with drug dealers. In that capacity, the CI met appellant. The CI indicated his desire to purchase cocaine in the near future, and appellant provided the CI with his telephone number for that purpose. For the offense dated September 30, 2010, the State presented evidence that officers with the drug task force worked in conjunction with the CI to arrange for the CI to purchase an amount of cocaine from appellant. In the presence of officers, the CI contacted appellant through the given telephone number and arranged to meet him at an apartment in the Fort Hill public housing complex. When the CI arrived, appellant exited the apartment and sold cocaine to the CI. The State provided both audio and video recordings of the transaction, and the CI further identified appellant in a photograph array. By stipulation, the State introduced a laboratory report from the TBI confirming that the substance in question was, in fact, 0.86 grams of cocaine base.

On November 22, 2010, following the same procedure, the CI, in the presence of drug task force officers, telephoned appellant and arranged to purchase cocaine from him. This time, however, appellant relocated from the agreed-upon meeting place of "the Crossing" to a local grocery during the course of the transaction. The CI and appellant eventually met at the Westside Grocery. When appellant parked his vehicle, the CI approached the driver's side, and appellant handed cocaine to him. Again, the State provided recorded evidence of the transaction, and the CI confirmed that he had, indeed, purchased cocaine from appellant a second time. The TBI laboratory report confirmed that the substance contained 0.7 grams of cocaine base.

In both instances, the evidence, viewed in the light most favorable to the State, supports appellant's convictions. The State established that appellant knowingly engaged in the sale: he provided the CI with his telephone number for that express purpose and met with the CI on two occasions, again for the same purpose. The State proved that the substance was a Schedule II controlled substance, to-wit: cocaine, that weighed more than 0.5 grams on each occasion. Appellant is not entitled to relief on this issue.

B. Consecutive Sentencing

Appellant contests the consecutive sentence alignment of his two thirty-year sentences. He does not contest the length of his sentences, nor does he contest consecutive sentence alignment with the sentence upon which he was paroled at the time he committed the instant offenses. *See* Tenn. R. Crim. P. 32(c)(3)(A) (mandating consecutive sentencing for a felony committed while on parole for a felony).

Prior to 2013, on appellate review of sentence alignment issues, courts employed an abuse of discretion standard of review. *See State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999). Our supreme court has since extended the standard of review enunciated in *State v. Bise*, abuse of discretion with a presumption of reasonableness, to consecutive sentencing determinations. *State v. Pollard*, ___ S.W.3d ___, ___, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *9 (Tenn. Dec. 20, 2013); *Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) (modifying standard of review of within-range sentences to abuse of discretion with a presumption of reasonableness); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying abuse of discretion with a presumption of reasonableness to review of alternative sentencing determinations by the trial court). Thus, the presumption of reasonableness gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b) . . . ." *Pollard*, 2013 WL 6732667, at *9.

The procedure used by the trial courts in deciding sentence alignment is governed by Tennessee Code Annotated section 40-35-115, which lists the factors that are relevant to a trial court's sentencing decision. In addition to the considerations contained in section 40-35-115, imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1). Moreover, the length of the resulting consecutive sentence must be "no greater than that deserved for the offense committed." *Id.* § 40-35-103(2). The court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the following seven statutory criteria exists:

(1)     The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2)     The defendant is an offender whose record of criminal activity is extensive;

(3)     The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4)     The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5)     The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6)     The defendant is sentenced for an offense committed while on probation; or

(7)     The defendant is sentenced for criminal contempt.

The *Pollard* court reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." *Pollard*, 2013 WL 6732667, at *9 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.*

Of the seven statutory factors, the trial court found subsection (2), that appellant "is an offender whose record of criminal activity is extensive," applicable to this case. Tenn. Code Ann. § 40-35-115(2). Our supreme court has stated that "[c]onsecutive sentencing based on an offender's extensive record of criminal activity is appropriate to protect society from those who 'resort to criminal activity in furtherance of their anti-societal lifestyle.'" *Dickson*, 413 S.W.3d at 749 (quoting *Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976)). In this case, the trial court noted that appellant had garnered six class B felonies and one class C felony. Our review of the presentence report in this case reveals that all seven of these felonies were for the sale of cocaine and further shows that appellant's string of convictions for the sale of cocaine began in 1993 and continued until the case *sub judice*. In addition, appellant had seven misdemeanor convictions and various traffic offense convictions. "Trial

courts can consider prior misdemeanors in determining whether a defendant has an extensive record of criminal activity" in part because "they indicate a consistent pattern of operating outside the confines of lawful behavior." *Dickson*, 413 S.W.3d at 748. We note that an appellant's record does not have to exceed the number of convictions required to determine his sentencing range to be considered "extensive" under the consecutive sentencing statute; nonetheless, in this case, appellant's record did in fact exceed the combination of six class A, B, or C felonies necessary to place him in the range of a career offender upon commission of a class B felony. *Id.* § 40-35-108(a)(1); *cf.* Tenn. Code Ann. § 40-35-114(1) (noting that to enhance a within-range sentence, the number of criminal convictions must exceed those necessary to establish the appropriate range).

Furthermore, while appellant claims that the "sentence does not correlate with the true nature of the offense" because the record does not reflect that "[a]ppellant was a regular seller of drugs," the record belies his contention. As previously stated, appellant had seven previous convictions for the sale of cocaine stretching over two decades, and the trial court noted that appellant was on parole for at least one of these prior offenses when he committed the instant offenses. These facts indicate that appellant was "a regular seller of drugs." The record shows that the trial court articulated reasons for imposing consecutive sentences; therefore, under *Pollard*, we presume that its sentencing was reasonable. *See Pollard*, 2013 WL 6732667, at *9. Moreover, our review of the record indicates that the trial court did not abuse its discretion in sentencing appellant. Appellant is without relief as to this issue.

## C. *Batson* Challenge

In his brief, appellant argues that the trial court erred in denying his *Batson* challenge, asserting that five of the seven peremptory challenges issued by the State were against African-American jurors and that the resulting jury was all Caucasian.

In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the United States Supreme Court held that "the Equal Protection Clause [of the United States Constitution] forbids the prosecutor to challenge potential jurors solely on account of their race." Accordingly, the State's use of peremptory challenges to intentionally exclude jurors on the basis of race violates a defendant's right to equal protection. *Id*.

"'The peremptory challenge is one of the oldest established rights of the criminal defendant.'" *State v. Spratt*, 31 S.W.3d 587, 597 (Tenn. Crim. App. 2000) (quoting *United States v. Annigoni*, 96 F.3d 1132, 1136 (9th Cir.1996)). Peremptory challenges are "'an essential part of the trial,'" *id.* (quoting *Lewis v. United States*, 146 U.S. 370, 376 (1892)), constituting "'one of the most important of the rights secured to the accused,'" *id.* at 598 (quoting *Pointer v. United States*, 151 U.S. 396, 408 (1894)). Because of the importance of

the right to make peremptory challenges, courts have traditionally afforded an "extraordinary remedy . . . to an accused who was deprived of the right: reversal of conviction, without a showing of prejudice." *Id.* (citing *Lewis*, 146 U.S. at 376).

As this court noted in *Spratt*:

> Peremptory challenges, along with challenges for "cause," are the principal tools that enable litigants to remove unfavorable jurors during the jury selection process. The central function of the right of peremptory challenge is to enable a litigant to remove a certain number of potential jurors who are not challengeable for cause, but in whom the litigant perceives bias or hostility. The function of the [peremptory] challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise.

*Id.* at 598 (internal citations and quotation marks omitted).

At the outset, we note that the proper time to lodge a *Batson* challenge is prior to accepting the jury and prior to the jury's being sworn. *State v. Kiser*, 284 S.W.3d 227, 256 n.29 (Tenn. 2009) (citing *State v. Peck*, 719 S.W.2d 553, 555 (Tenn. Crim. App. 1986)). Our Supreme Court instructed that when ruling on a *Batson* challenge, trial courts should utilize "a three-pronged analysis for determining whether the suspect challenges were impermissibly based on the potential juror's race." *Hugueley*, 185 S.W.3d at 368. Under this three-pronged approach, "the defendant must establish a *prima facie* case of purposeful discrimination against a prospective juror." *Id.* To do so, a defendant may rest "'solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.'" *Id.* (quoting *Batson*, 476 U.S. at 96).

For the second prong of the analysis, if a defendant establishes "a *prima facie* showing of purposeful discrimination," only then must the State provide a neutral basis for the challenge. *Id.* (citing *Batson*, 476 U.S. at 97). The State's explanation "must be a clear and reasonably specific account of the prosecutor's legitimate reasons for exercising the challenge." *Id.* (citing *Batson*, 476 U.S. at 98 n.20). "[T]he race or gender neutral explanation need not be persuasive, or even plausible." *Id.* (citing *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)). "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Id.* (quoting *Purkett*, 514 U.S. at 768); *see also Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion).

Finally, if the State provides a race-neutral reason for the challenge, "the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination." *Id.* (citing *Batson*, 476 U.S. at 98). Under this last prong, "the party raising the *Batson* objection bears the burden of persuading the trial court that the other party has engaged in purposeful and impermissible discrimination." *Kiser*, 284 S.W.3d at 258 (citing *Batson*, 476 U.S. at 93); *see Purkett*, 514 U.S. at 768 (noting that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"). For the trial court, "'the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.'" *Id.* at 259 (quoting *Hernandez*, 500 U.S. at 365).

This court has previously noted that "'determination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence.'" *Id.* at 255 (quoting *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994)). Accordingly, the trial court's findings in this regard are attributed great weight and will not be set aside unless they are clearly erroneous. *Id.* (citing *Hugueley*, 185 S.W.3d at 369). For this reason, when ruling on a *Batson* challenge, the trial court must give specific reasons for each of its factual findings, including: (1) whether the objecting party has established a *prima facie* showing of purposeful discrimination; (2) whether the responding party has shown a neutral basis for the challenge; and (3) whether the totality of the circumstances support a finding of purposeful discrimination. *Hugueley*, 185 S.W.3d at 369 (citing *Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 906 (Tenn. 1996)).

In this case, after the jury was selected but before it was sworn, the trial court excused the jurors for a short recess. During this recess, the trial court, *sua sponte*, announced that the State had issued peremptory challenges against five African-American jurors. It further noted that "[i]n each case[,] they followed the wise practice of stating in writing why they were doing that, stating what I consider to be in each case a race[-]neutral reason . . . ." The trial court did not read the reasons into the record but, rather, included those writings in the trial record as an exhibit. Appellant made no argument with regard to this issue in the trial court. The only comments offered by appellant's counsel were a request to read the reasons given by the State and an agreement with a statement made by the trial court that this could be an issue on appellate or post-conviction review.

In light of appellant's failure to raise a *Batson* challenge or advance any argument in the trial court in this regard, we must first determine whether he has waived this issue for appellate review. This court has recently considered a similar issue, wherein we described the trial court's addressing of the *Batson* issue *sua sponte* as "proactive." *State v. Jeffrey L. Vaughn*, No. W2012-01987-CCA-R3-CD, 2013 WL 1282331, at *7 (Tenn. Crim. App.

March 28, 2013), *perm. app. denied* (Tenn. Sept. 25, 2013). In *Jeffrey L. Vaughn*, as in this case, after the trial court addressed the issue on its own motion, appellant failed to make any further argument. *Id.* This court reasoned:

> We can find no further discussion of the issue in the record. It does not appear that the defendant ever actually objected to the prosecution's use of its preemptive strikes[] or that the defendant otherwise raised the *Batson* issue until his motion for new trial. Consequently, it appears to us that the defendant waived his *Batson* claim by failing to raise a contemporaneous objection or filing timely motion concerning the issue. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The trial court's failure to engage in a more extended discussion of the *Batson* issue appears to be the natural result of the defendant's failure to raise it in a timely fashion.
>
> It is possible that the defendant failed to raise a contemporaneous objection on the *Batson* issue because he interpreted the trial court's remarks as raising a *Batson* challenge *sua sponte*. He may further have interpreted the trial court's statements to the effect that the prosecution had provided racially-neutral explanations for striking both jurors as implicitly making the additional findings that, under the totality of the circumstances, no discrimination had occurred. Consequently, the defendant may have understood the *Batson* issue to have been contemporaneously raised and passed upon by the trial court. However, even if this court were inclined to ignore the defendant's waiver in light of this interpretation of the record, the defendant has failed to establish that the trial court erred by concluding that the State had no discriminatory intent.

*Id.* We conclude that this court's *Jeffrey L. Vaughn* opinion is instructive on this issue. Although appellant failed to raise an objection or further develop the record, we can rationally interpret these failures as his understanding that any impending *Batson* challenges had been ruled upon by the trial court. Thus, while we are inclined to apply the waiver provision contained in the Tennessee Rules of Appellate Procedure, we will nonetheless review the merits of the claim.

The State exercised the following peremptory challenges against African-American venire members: (1) Marjorie Donald, who had an "extended family relation" to appellant; (2) Annie Donald, whose son-in-law was appellant's brother; (3) Moselle House, whom the

CI had reportedly seen "associating" with appellant; (4) Carlitha McKinley, who knew appellant; and (5) Jesse Greene, also reported by the CI as having been an "associate" of appellant. We reiterate our conclusion in *Jeffrey L. Vaughn*:

> [Two] potential [jurors'] status as the defendant's friend and the other potential [jurors'] status as the defendant's [extended family] provided the State with readily-defensible, racially-neutral reasons for striking them. By ruling in favor of the State, the trial court necessarily assessed the prosecutor's credibility and credited the State's proffered rationales. The trial court was in the best position to assess the demeanor of the prosecutor. The defendant directs our attention to nothing in the record that would establish that the trial court's determination was erroneous. The defendant's claim for relief on the grounds that the State violated *Batson* by striking [] African-American potential jurors from the venire is denied.

As noted above, "the party raising the *Batson* objection bears the burden of persuading the trial court that the other party has engaged in purposeful and impermissible discrimination." *Kiser*, 284 S.W.3d at 258 (citing *Batson*, 476 U.S. at 93); *see Purkett*, 514 U.S. at 768 (noting that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"). Appellant offered no such "persuasion" in the trial court. Appellant has failed to establish that he is entitled to relief on this claim of error.

## CONCLUSION

Based upon our review of the record, the briefs of the parties, arguments of counsel, and applicable legal authorities, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE