# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 7, 2014

## STATE OF TENNESSEE v. STANLEY BLUE

**Appeal from the Criminal Court for Shelby County**
**No. 04-02312    James C. Beasley, Jr., Judge**

---

**No. W2013-00437-CCA-R3-CD  - Filed April 14, 2014**

---

The defendant, Stanley Blue, appeals from his resentencing to an effective term of forty-six years as a Range III, persistent offender for his convictions for facilitation of first degree murder, attempted second degree murder, and reckless endangerment. On appeal, the defendant contends that his sentence is excessive, and the State agrees. Based upon our review of the record, we conclude that the trial court erred in sentencing the defendant to forty years for attempted second degree murder and in classifying the defendant as a Range III, persistent offender for his reckless endangerment conviction. Accordingly, the trial court's judgments are affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part, and Remanded**

ALAN E. GLENN, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and ROGER A. PAGE, JJ., joined.

Patrick E. Stegall, Memphis, Tennessee, for the appellant, Stanley Blue.

Robert E. Cooper, Jr., Attorney General & Reporter; Deshea Dulany Faughn, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Reginald Henderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant's convictions arose from a shooting that occurred at Brown's Barbecue

restaurant in Memphis, Tennessee, on March 11, 2003. During the shooting, Mareco Robinson was killed and Jessie Lewis was wounded. In our opinion in the defendant's initial appeal, we summarized the evidence presented at trial as follows:

> Toya Sanders testified that she and Robinson were childhood friends. She recalled that she saw Robinson at a club, the Hard Luck Café, on the night of March 11, 2003, and that everyone there was "[h]aving a good time." She admitted that she had smoked some marijuana that night but said that she did not drink. She stated that the defendant, whom she had known since childhood as "Puff," was also at the club that night. She saw the defendant and another male, whom she later learned through the course of the investigation was Eddie Partee, leaving the club in a Cadillac. After leaving the club at approximately 3:00 a.m., Sanders and her friends decided to go to Brown's Barbecue to get something to eat. When they arrived at Brown's Barbecue, the defendant and Partee were already at the restaurant. Soon after she and her friends arrived, Robinson arrived at the restaurant.

> Sanders testified that the defendant went out to his car while Partee waited in line for his order. She recalled that Robinson and Partee exchanged words about Robinson's order while waiting in line. Robinson went outside to his car and Partee followed him but went to the defendant's vehicle where Sanders witnessed Partee and the defendant talking. When Robinson returned to the restaurant, Partee and the defendant followed him. While the defendant went to the bathroom, Partee pulled a gun and shot Robinson in the back of the head. As soon as Partee shot Robinson, the defendant came out of the bathroom shooting "a little old bitty gun." Everyone fled the restaurant for safety. Sanders saw Partee and the defendant leave the restaurant, get into the Cadillac and flee the scene.

> Sanders testified that as everyone was leaving the restaurant, Jessie Lewis was walking in. She said that Partee and the defendant shot Lewis as he was entering the restaurant. She stated that as the men returned, she "was trying to get everybody out" because she could tell that something was about to happen when the men went outside to the parking lot. Sanders testified that she never saw Robinson threaten or display a weapon to either the defendant or Partee, but she also admitted that she could not see whether Robinson retrieved anything from his car while he was outside listening to music with his hood up.

> Jessie Lewis testified that he spoke with Robinson at Brown's Barbecue

on the night of March 11, 2003. He recalled Robinson telling him that "something was wrong with [Partee]." Before Robinson could explain to Lewis what he meant, Partee entered the restaurant and shot him. Lewis had turned his back to Robinson but upon hearing the shot, he turned around and saw Partee standing over Robinson holding the gun. Lewis stated that the defendant walked from the bathroom and fired two more shots toward Robinson as he lay on the ground. Lewis recalled that everyone except him had left the restaurant with the firing of the first shot. He said that he was standing at the door "so shocked, [he] couldn't go nowhere [sic]" when the defendant came from the bathroom. The defendant and Partee walked to the front door and saw Lewis. The defendant then "bumped Partee in the back," and Partee "looked at [Lewis] and kicked the door open and shot [him]." Lewis was shot in the groin with the bullet exiting through his hip. He saw the defendant and Partee leave in the Cadillac with Partee driving. Lewis later identified the defendant as one of the individuals involved in the shooting. Lewis also stated that he did not see Robinson with a gun.

Kevia Taylor testified that she was with her cousin, Toya Sanders, at Brown's Barbecue on March 11, 2003. Her testimony was consistent with Sanders' testimony regarding the events leading up to the shooting. She witnessed Partee go to a vehicle, retrieve a pistol and load it before returning to the restaurant. She recalled that the defendant looked at Partee as they returned to the restaurant and she took that as a signal between the two men. Taylor stated that she "knew something was fixing to go down" so she started to leave the restaurant. As she was leaving, she heard the gunshots. She ran behind a building and did not see the defendant or Partee leave. Afterwards, she saw that Lewis had been shot as well as Robinson. Taylor later identified the defendant from a photographic lineup. Taylor admitted that she saw Robinson open the hood of his car and go to his trunk, but she could not see whether he got anything from the trunk before returning to the restaurant.

Memphis Police Department Officer Kimberly Houston testified that she responded to the scene of the shooting at Brown's Barbecue on March 11, 2003. When she arrived, she observed a black male on the floor suffering from a gunshot wound to the head and another black male sitting on a bench who had been shot in the leg. The man with the wound to the head was alive and conscious. She recalled that he was mumbling as if attempting to say something but that she could not understand him. She tried to calm him and tell him to stop talking; as she heard the ambulance approach, she looked to discover that he was no longer breathing. When the paramedics arrived, the

man with the wound to his leg was treated and taken to the hospital by ambulance. Officer Houston stayed at the scene until the deceased victim was removed. Officer Houston also testified that she secured witnesses at the scene until more officers arrived to get information and statements from them.

Memphis Police Department Lieutenant Daniel Parris testified that he was assigned to the crime scene unit at the time of the offenses. He related that his general duties consisted of documenting the facts and physical evidence of a crime scene through photographs, sketches, and recovered evidence. Lieutenant Parris sketched the crime scene at Brown's Barbecue. He documented eight items at the scene, including blood, a spent bullet, bullet holes and strikes, and two forty caliber shell casings.

Kcbena Cash of the Memphis Police Department testified that the defendant was developed as a suspect in the shootings within a week of the incident. After a warrant was issued for the defendant's arrest, Officer Cash began to look for the defendant. After Officer Cash talked to several family members and acquaintances of the defendant, the defendant telephoned Officer Cash himself. She explained to the defendant that there was a warrant issued for him and asked him to come in voluntarily. She recalled that the defendant did not agree to turn himself in. As she continued her efforts to locate the defendant, she spoke with the defendant daily on the telephone. She recalled that he always contacted her on private numbers. She testified that each time they talked "[t]he gist of the conversation was to turn himself in." Eventually, Officer Cash received a phone call or "tip" that led her to a possible location of the defendant. Upon arrival at the residence, the defendant was gone but a forty caliber handgun was discovered and taken into property at the Memphis Police Department. Eventually, Officer Cash received another tip regarding the defendant's whereabouts at a different residence and he was apprehended there while trying to escape from a window. Additionally, another handgun and forty caliber ammunition were found at the residence. On cross-examination, Officer Cash admitted that the defendant was not found at the first residence searched and that no one knew who left the forty caliber handgun at the residence.

Sergeant William D. Merritt of the Memphis Police Department testified that he acted as the case coordinator on the defendant's case. As part of his duties as the case coordinator, he sent items to the Tennessee Bureau of Investigation (TBI) for testing. Sergeant Merritt sent a Keltec forty caliber handgun, two forty caliber shell casings, one bullet projectile, and a Ruger nine

millimeter semi-automatic to the TBI for analysis. Sergeant Merritt testified that the Ruger was recovered near a dumpster outside the restaurant. He further stated that his investigation revealed that Mario Broadnax had taken the Ruger from the victim and placed it near the dumpster.

TBI Special Agent Steve Scott testified as a firearms identification expert. After identifying the items submitted by Sergeant Merritt, Special Agent Scott determined that the spent cartridges and bullet recovered at the scene had been fired by the Keltec handgun. Testing of the Ruger pistol revealed that it would eject a shell casing much like the Keltec; however, no shell casings matching the Ruger were discovered at the scene. Special Agent Scott stated that the forty caliber bullet recovered from the victim's body was fired from a revolver -- either a Smith and Wesson Special Revolver or a Remington Magnum Revolver -- and not a semi-automatic pistol like the Keltec or Ruger. The gun that fired the bullet recovered from the victim was not presented to the TBI for testing.

Dr. O'Brian Smith testified that he was the Shelby County Medical Examiner at the time of the shooting and that he performed the autopsy on the victim and determined that he suffered a gunshot wound to the right side of his head behind his ear that produced brain damage before the bullet came to rest in the front portion of the victim's brain. Toxicology testing of the victim's blood revealed a .203 grams percent blood alcohol content which Dr. Smith characterized as "moderately elevated." Toxicology testing revealed no presence of drugs. Dr. Smith testified that the cause of death was a gunshot wound to the head and opined that "in most instances, this bullet . . . wound would have a lethal outcome."

The State presented the prior sworn testimony of Mario Broadnax which was read to the jury by a court reporter. Broadnax testified that he had been at the Hard Luck Café on the night of the incident and that he had not been drinking that night, although he did admit to smoking one or two marijuana cigarettes earlier in the evening. He went to Brown's Barbecue after leaving the club and recalled seeing the victim there when he arrived. He could tell that the victim and some other men were arguing and he saw "one or two people" go inside the restaurant with guns. Broadnax testified that when he heard gunshots he ran to the back of the building. When he returned to the front of the parking lot, he discovered the surviving victim, Jessie Lewis, lying on the ground with a gunshot wound. He ran inside to check on the other victim, Mareco Robinson, who was still breathing. He told the employees to

call the police.

Broadnax stated that another witness indicated to him that the victim had a weapon so he returned to the victim, removed the gun from the victim's belt, and hid it behind the restaurant. Other witnesses told the police that Broadnax removed the gun so, several days later, he led the police to the location of the gun. He explained that he removed the gun because he "felt that if [the police] came and found a gun on [the victim], you know, that they probably wouldn't, you know, try to find out who did it." Broadnax identified the defendant as one of the people he saw at the restaurant that night. He also stated that he removed the gun from underneath the victim's shirt. He admitted on cross-examination that he could not see who fired the shots because he ran behind the building when the shooting began. After the reading of Broadnax's testimony, the State rested its case-in-chief.

The defendant presented the testimony of Daryl Powell, who stated that he was at Brown's Barbecue on the night of the shooting. He recalled that he was there sleeping but that he "wasn't supposed to be" there. He said that he was asleep in a booth when the argument between the victim and the other men woke him up. He said that he knew the victim by his neighborhood nickname of "C-Murder." He saw the victim go to his car and return to the restaurant with a black gun in his hand. He testified that everyone in the restaurant "just went hysterical" and the shooting began. He did not know the man who shot the victim. He reiterated that he saw a gun in the victim's hand when the shooting occurred. He testified that when one person shot the victim he just dropped and then another individual began shooting as well. He saw the two shooters leave the scene in a Cadillac. On cross-examination, Powell was confronted with his statement to police that failed to mention the presence of the victim's gun. He explained that maybe the police did not write that down and that he did not want "to be in everybody else's business" but that he definitely saw the victim with a gun.

Calandra Shaw testified that she was working at Brown's Barbecue on the night of the shooting. She had worked at the restaurant for about fifteen years and knew the victim, "Reco," as a regular customer. She recalled that Reco and another man argued at the front counter for about ten minutes. She recalled that the other man left the restaurant and, about ten minutes later, she heard shooting. Shaw testified that she crawled to lock the door so no one else would come inside during the shooting. She stated that she heard a quick series of gunshots. When the shooting ended, she stood up to see the victim

-6-

fall to the floor. She saw a man in a yellow shirt remove a gun from the victim's pocket. On cross-examination, she stated that she did not see the victim get shot, but she did see him fall to the ground after being shot.

Memphis Police Department Officer Danny James testified that he worked as a crime scene officer at the time of the shooting. He stated that he photographed the location of a gun found on the steps outside the restaurant.

State v. Stanley Blue, No. W2007-00292-CCA-R3-CD, 2009 WL 723845, at *1-5 (Tenn. Crim. App. Mar. 19, 2009), perm. app. denied (Tenn. Oct. 5, 2009).

At the conclusion of the trial, the defendant was convicted of facilitation of premeditated first degree murder, attempted second degree murder, and reckless endangerment. The trial court sentenced the defendant to thirty-four years, fifteen years, and six years, respectively. The trial court also ordered that the thirty-four-year sentence be served consecutively to the six-year sentence for a total effective sentence of forty years. The defendant did not appeal his sentence, but this court affirmed his convictions on direct appeal. See id.

The defendant subsequently filed a petition for post-conviction relief in which he asserted that he received the ineffective assistance of counsel and that his sentence was illegal. The post-conviction court granted the petition in part and ordered a new sentencing hearing. On appeal by the State, this court affirmed the post-conviction court's judgment and remanded the case for a new sentencing hearing. See Stanley Blue v. State, No. W2011-01936-CCA-R3-PC, 2012 WL 3362270, at *1 (Tenn. Crim. App. Aug. 15, 2012).

At the resentencing hearing, the State submitted the defendant's presentence report into evidence. The defendant did not present any proof.

In sentencing the defendant, the trial court noted that the defendant was convicted in count one of facilitation of first degree murder, a Class A felony; "in count two of criminal attempt to commit murder in the first degree, which is a [C]lass A felony"; and in count three of reckless endangerment with a deadly weapon, a Class E felony. The trial court found that the defendant was a Range III, persistent offender as to all three convictions. The court noted that the defendant had two prior aggravated robbery convictions and a prior attempted second degree murder conviction, all Class B felonies. The defendant also had prior convictions for evading arrest and theft of property valued at more than $500, both Class E felonies.

The trial court found as an enhancement factor for each conviction that the defendant

had a previous history of criminal convictions in addition to those necessary to establish his range. See Tenn. Code Ann. § 40-35-114(2) (Supp. 2002). The court noted that in addition to the defendant's five prior felony convictions, he had multiple misdemeanor convictions. With regard to mitigating factors, the trial court stated that under the "catch-all" factor, it considered the testimony of the defendant's mental health expert at trial and the disparity between the defendant's sentence and co-defendant Eddie Partee's sentence. See id. § 40-35-113(13). The trial court noted that the defendant was tried first and that following his conviction, the co-defendant pleaded guilty and received a lesser sentence.

The trial court determined that the defendant's sentencing range for a Class A felony was forty to sixty years. He sentenced the defendant to forty years for each conviction for facilitation of first degree murder and attempted second degree murder and ordered that the sentences run concurrently. The trial court determined that the defendant's sentencing range for a Class E felony was four to six years and imposed a six-year sentence for the reckless endangerment conviction.

The trial court found that the defendant was an offender whose record of criminal activity was extensive. See Tenn. Code Ann. § 40-35-115(b)(2). The trial court also found that the defendant was a dangerous offender whose behavior demonstrated little regard to human life and had no hesitation about committing a crime where the risk to human life is high. See id. at (b)(4). Based upon these findings, the trial court ordered the defendant to serve his six-year sentence for reckless endangerment consecutively to his forty-year sentence for his other convictions, for an effective sentence of forty-six years.

## ANALYSIS

The defendant contends that the trial court erred in sentencing him to forty years for attempted second degree murder, in finding that he qualified as a Range III persistent offender with regard to his reckless endangerment conviction, and in imposing consecutive sentences. The offenses in this case occurred on March 11, 2003. Effective June 7, 2005, certain provisions of the 1989 Sentencing Act were amended to reflect an advisory, non-mandatory sentencing scheme. See, e.g., Tenn. Code Ann. §§ 40-35-114, -210 (2003 & Supp. 2005). The amended provisions apply to sentencing for criminal offenses committed on or after June 7, 2005. Offenses committed prior to June 7, 2005, are governed by prior law. A defendant who is sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, may elect to be sentenced under the amended provisions of the Act by executing a waiver of ex post facto protections. See Tenn. Pub. Acts, ch. 353, § 18; Tenn. Code Ann. § 40-30-210 (2003 & Supp. 2005).

The defendant in the present case committed the offenses prior to the effective date

of the amendments. While the defendant could have elected to be sentenced pursuant to these amended provisions, he did not execute an ex post facto waiver. Therefore, the amended 2005 provisions are not applicable to the defendant's case.

When a defendant challenges the length and manner of service of a sentence, this court conducts a de novo review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d).[1] We condition this presumption upon "the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). We do not apply the presumption to the legal conclusions reached by the trial court in sentencing the defendant or to the determinations made by the trial court predicated upon uncontroverted facts. See State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review of a sentence, we must consider (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel about sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; (h) any statements made by the defendant on his own behalf; and (i) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103; 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; Ashby, 823 S.W.2d 169.

## A. Sentence for Attempted Second Degree Murder

The defendant asserts that the trial court erred in imposing a forty-year sentence for the conviction for attempted second degree murder because the sentence is outside the applicable range. The State concedes that the trial court erred, and we agree.

Attempted second degree murder is a Class B felony. See Tenn. Code Ann. §§ 39-12-

---

[1] This standard of review should be applied in this case because the defendant did not elect to be sentenced in accordance with the law in effect after the 2005 amendments to the Sentencing Act. In State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012), the Tennessee Supreme Court modified the appellate standard of review of sentencing issues from "de novo with a presumption of correctness" to "abuse of discretion with a presumption of reasonableness."

107(a), 39-13-210(c). The trial court found that the defendant was a Range III, persistent offender with regard to the attempted second degree murder conviction, a finding that the defendant does not challenge. As a result, the defendant's applicable sentencing range for attempted second degree murder was "not less than twenty (20) nor more than thirty (30) years." Tenn. Code Ann. § 40-35-112(c)(2). Because the trial court imposed a sentence for the offense that was outside the applicable range, we reverse the trial court's judgment and remand the case to the trial court for resentencing on the attempted second degree murder conviction.

**B. Status as Range III, Persistent Offender for Reckless Endangerment**

The defendant contends that the trial court erred in sentencing him as a Range III, persistent offender for the reckless endangerment conviction. The State concedes that the trial court erred in this regard, and we agree.

A persistent offender includes a defendant who has received "[a]ny combination of five (5) or more prior felony convictions within the conviction class or higher[.]" Tenn. Code Ann. § 40-35-107(a)(1). The trial court found that the defendant has five prior felony convictions within the conviction class or higher. The court based its finding upon the defendant's prior convictions for attempted second degree murder, two counts of aggravated robbery, Class E felony evading arrest, and theft over $500. The defendant asserts that he committed the offenses of evading arrest and theft over $500 within the same twenty-four-hour period and that as a result, the convictions constitute one conviction.

Tennessee Code Annotated section 40-35-107(b)(4) (1997) provides:

Convictions for multiple felonies committed as part of a single course of conduct within twenty-four (24) hours constitute one (1) conviction for the purpose of determining prior convictions; however, acts resulting in bodily injury or threatened bodily injury to the victim or victims shall not be construed to be a single course of conduct[.][2]

The presentence report reflects that the Class E felony offenses of evading arrest and theft

_____

[2] In 2005, section 40-35-107(b)(4) was amended and now provides:

Except for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury or threatened bodily injury to the victim or victims or convictions for the offense of aggravated burglary under § 39-14-403, convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions.

over $500 occurred on the same date. Moreover, neither offense threatened or resulted in bodily injury to the victim. See Tenn. Code Ann. §§ 39-14-103(a), 39-16-603(b). As a result, the offenses should have been treated as one conviction, reducing the number of the defendant's prior felony convictions to four.

Accordingly, the trial court erred in classifying the defendant as a Range III, persistent offender regarding his reckless endangerment conviction. Rather, the defendant qualifies as a Range II, multiple offender. See Tenn. Code Ann. § 40-35-106 (1997). The sentencing range for a Range II, multiple offender convicted of reckless endangerment, a Class E felony, is two to four years. See Tenn. Code Ann. § 40-35-112(b)(5). The defendant's six-year sentence for the reckless endangerment conviction is outside the applicable range. Therefore, we remand the case to the trial court for a resentencing hearing on the reckless endangerment conviction.

## C. Consecutive Sentencing

The defendant contends that the trial court erred in ordering that his sentence for reckless endangerment be served consecutively to his convictions for facilitation of first degree murder and attempted second degree murder. The determination of whether to order consecutive rather than concurrent sentences is a matter primarily within the discretion of the trial court. See State v. Hastings, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999). The procedure is governed by Tennessee Code Annotated section 40-35-115, which lists the factors that are relevant to a trial court's sentencing decision. The court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the seven statutory criteria exists. Tenn. Code Ann. § 40-35-115(b). Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1). The length of the resulting consecutive sentence must be "no greater than that deserved for the offense committed." Tenn. Code Ann. § 40-35-103(2).

In ordering partial consecutive sentences, the trial court found that the defendant "is an offender whose record of criminal activity is extensive." See Tenn. Code Ann. § 40-35-115(b)(2). Consecutive sentencing based on a defendant's extensive record of criminal activity is appropriate "to protect society from those who 'resort to criminal activity in furtherance of their anti-societal lifestyle.'" State v. Dickson, 413 S.W.3d 735, 749 (Tenn. 2013) (quoting Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976)). Section 40-35-115(b)(2) does not distinguish between felonies and misdemeanors. Id. Rather, trial courts can consider prior misdemeanors in determining whether a defendant has an extensive record of criminal activity. Id. The defendant in this case had five prior felony convictions and numerous prior misdemeanor convictions. While some of the defendant's misdemeanor convictions were driving offenses, the convictions indicate "a consistent pattern of operating

outside the confines of lawful behavior." Id. This evidence supports the trial court's determination that the defendant has an extensive record of criminal activity.

The trial court also found that the defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b)(4). In State v. Wilkerson, 905 S.W.2d 933, 937-39 (Tenn. 1995), our supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: the court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct.

The trial court found that the circumstances of the case were aggravated. The court noted that the restaurant where the shootings occurred was crowded, that the defendant and the co-defendant left following an altercation and returned with guns, and that the defendant "stood guard" by a bathroom door and fired multiple shots after the co-defendant shot the victim. The trial court found that the defendant had no hesitation about committing a crime where the risk to human life was high. The trial court further found that the consecutive sentences were reasonably related to the offenses for which the defendant was convicted and were necessary to protect the public from further criminal conduct by the defendant.

The defendant argues that the trial court failed to consider the principles of sentencing and the sentencing disparity between him and the co-defendant. The trial court, however, stated that it considered the principles of sentencing and the sentencing disparity in imposing the sentence. We conclude that the trial court's imposition of partial consecutive sentences is supported by the record.

## CONCLUSION

We reverse the defendant's sentences for attempted second degree murder and reckless endangerment and remand the case to the trial court for a new sentencing hearing regarding these two convictions. We otherwise affirm the judgments of the trial court.


_____
ALAN E. GLENN, JUDGE