IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 2, 2024 at Jackson

## STATE OF TENNESSEE v. STEVEN MITCHEL AMBROSE

**Appeal from the Circuit Court for Marshall County**
**No. 21CR59    M. Wyatt Burk, Judge**

———————————

### No. M2023-00097-CCA-R3-CD

———————————

The Defendant, Steven Mitchel Ambrose, appeals his jury convictions for four counts of rape of a child and his resulting effective sentence of sixty years.  On appeal, he argues: (1) the trial court erred by denying his motion to suppress his statements made to law enforcement; (2) the State provided an insufficient election of offenses which deprived him of a verdict by a unanimous jury; (3) the evidence is insufficient to support his convictions; (4) his sentence is excessive; and (5) the multiple "procedural errors and constitutional violations" that occurred in the trial court violated his right to due process and entitle him to relief under the cumulative error doctrine.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TOM GREENHOLTZ, JJ., joined.

John M. Schweri (on appeal), Columbia, Tennessee; and Jefre Goldtrap (at trial), Nashville, Tennessee, for the appellant, Steven Mitchel Ambrose.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and William B. Bottoms and Lee Brooks, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.    FACTUAL AND PROCEDURAL HISTORY

This case arises from the Defendant's sexually abusing the minor victim, S.P.,[1] from March 1, 2020, through July 10, 2020. From this alleged abuse, a Marshall County grand jury returned an eight-count indictment against the Defendant, charging him with rape of a child—counts 1 through 6 alleging penile penetration, and counts 7 and 8 alleging digital penetration. *See* Tenn. Code Ann. § 39-13-522. Prior to trial, the Defendant filed a motion to suppress his statements made to law enforcement during a recorded interview, alleging these statements were not freely and voluntarily given. Following a hearing, a transcript of which is not included in the appellate record, the trial court denied the motion. The Defendant proceeded to a jury trial on June 27, 2022.

At trial, the fourteen-year-old victim provided her birthdate and stated that she and her family, including her mother, stepfather,[2] and stepsister, were living with the Defendant in his home in March 2020. The house was a split-level, and the Defendant and his children lived downstairs, while the victim and her family lived upstairs. The first incident occurred sometime after the victim's twelfth birthday. The victim was wearing "short shorts like always" and helping the Defendant fold laundry in his bedroom when he asked her to lay on the bed and cuddle. The Defendant started kissing the victim, and his hand began going "lower" toward the victim's "private area." The victim referred to this area as her "V." She said that the Defendant touched this area with his hand and that his hand "went inside . . . [her] V." The Defendant's "D" also went inside the victim's "V." Another time, the "same thing" happened "without the laundry" while she and the Defendant were watching a movie. The Defendant touched the victim's "V" with his hand and his penis. The victim affirmed she was describing a man putting his penis inside her vagina.

She confirmed that this happened "other times" with the Defendant and that it was "the same thing . . . over and over and over again." The Defendant threatened to get her in trouble if she told anyone. While there was no "blood or bruises," it was "really painful" the first time, and she felt both physical and emotional pain. The victim felt "worthless" and affirmed she had resulting mental health issues. She stated that she used to "cut" herself, and now she "starve[s]" herself to make the pain go away.

While testifying on direct examination, the victim repeatedly said she felt anxious, had trouble breathing, could not remember certain information, and did not want to go into detail with her testimony. While asking the victim about the people she disclosed the abuse to, defense counsel objected to the State's asking leading questions. The trial court

---

[1] It is the policy of this court to refer to victims of sexual crimes by their initials.

[2] The record reflects this was her mother's boyfriend, although the victim referred to him as her father, and he referred to the victim as his child. We will refer to him as her stepfather.

responded, "Given the age, I know that sometimes [it] can be somewhat difficult but let's try as much as we can to keep it to direct." The State agreed to this directive. Later, still during the victim's direct examination, the State asked, "Okay. When he was touching your private area with his hands, can you tell me about that? Was it just outside your private area or something different?" The victim responded, "Can I just say different instead of explaining that? Because it's kind of hard." The State said, "Well, I need you to tell me." The defense again objected based on the State's asking leading questions. The trial court overruled the objection, reasoning the question asked was not leading.

In July 2020, the victim disclosed to Will Brown, a youth minister at a church she attended, that she was being inappropriately touched by the Defendant. Mr. Brown testified that he and another minister took the victim to her parents and helped her disclose the abuse. The victim's stepfather testified that the victim was moved out of the Defendant's house that day; the rest of her family left the next day. The Defendant and the victim's stepfather were best friends. Prior to the victim's disclosure, her stepfather did not believe the victim was in danger, even though he noticed the victim and the Defendant were "too close." In hindsight, the Defendant's behavior with the victim was "odd," as the victim was "always helping [the Defendant] with his laundry." He recalled that the victim's initial disclosure was vague and, as such, he did not report the disclosure to law enforcement. However, according to the victim's mother, the Department of Children's Services was contacted and, because the victim was having "a lot of emotional issues," she was advised not to pressure the victim into revealing more of what had happened. The victim's mother, prior to the disclosure, had observed that the victim and the Defendant were "real close" and would sometimes hold hands. One evening while at Henry Horton State Park, the victim and the Defendant were sitting beside each other at a table and were "just a little bit too close." While the victim did not appear afraid of the Defendant at that time, she acted differently and was withdrawn.

On October 24, 2020, the victim disclosed the sexual abuse to Frank Sullivan, the executive director of HOPEtown, and he called the Lewisburg Police Department ("LPD"). Captain Lonny Cook of the LPD responded to Mr. Sullivan's call and, while speaking to Mr. Sullivan, was advised that the victim reported being raped by her stepfather's friend. When Capt. Cook asked the victim the name of her stepfather's friend, she named the Defendant "without hesitation." She informed Capt. Cook that the sexual abuse happened ten or eleven times. Not having a phone number for the Defendant, Capt. Cook went to the Defendant's home.

While at the Defendant's home, Capt. Cook had his body camera ("bodycam") recording. When the bodycam video was entered as an exhibit, defense counsel renewed

his objection regarding the motion to suppress the Defendant's statements made during the interview. The trial court affirmed its previous ruling denying the motion, noting that the motion's basis was that the Defendant's statements were coerced. Additionally, prior to the recording being played for the jury, the trial court confirmed with both parties that the appropriate redactions from the recording had been made, specifically referring to the mention of a polygraph test therein. Defense counsel stated that he had reviewed the recording and that it "appear[ed] [the State] redacted everything." The recording was played for the jury.

The recording showed Capt. Cook making contact with the Defendant. While the Defendant could not come to the police station because he had two children at home and his car was inoperable, he agreed to speak with Capt. Cook. When Capt. Cook mentioned the allegations against the Defendant, the Defendant responded, "[N]o. . . . [A] hug was all I did," and demonstrated a side hug. The Defendant described the victim as always wanting hugs from him. He admitted the victim would help him with laundry in his bedroom but contended the door was always open. When Capt. Cook mentioned that the victim's parents had recalled seeing the Defendant's bedroom door closed while the victim and the Defendant were inside, the Defendant explained his daughter would often run through the house and slam doors, and the victim's parents may have seen the door closed during one of these times. During the conversation, the Defendant indicated the victim's stepfather's having a gun permit and said he did not want to take a chance with "that." The Defendant mentioned that while doing laundry with the victim, the victim said her uncle had done "sexual stuff" with her.

When asked if the Defendant and the victim watched movies together, the Defendant said they would sometimes, but his kids were present, and it would be hectic. However, according to the Defendant, the victim would try to put her arm around him while the two were watching movies. He said she saw him as a father figure. While at Henry Horton State Park, he recalled the two sitting next to each other at a picnic table with their shoulders touching. When asked if the Defendant had ever had sex with the victim, he responded, "Oh God no," said he felt sick, went to the bathroom, and appeared to vomit.

Capt. Cook told the Defendant that he thought the Defendant was being deceitful, as the Defendant had previously been informed of the victim's accusations against him. The Defendant apologized and said he was "really tired." The Defendant said his neighbor had informed him that the victim was saying "nasty stuff" about him. The Defendant was also informed that the victim had cut herself in the past and was thinking about starting

- 4 -

again. At this point in the conversation, Capt. Cook said the Defendant was not under arrest but nonetheless advised the Defendant of his *Miranda*[3] rights.

The Defendant agreed to continue speaking with Capt. Cook. The Defendant said the victim was always talking about boys she encountered on SnapChat. He mentioned that when the victim and her family first moved in with him, a woman was also staying in house. The Defendant said he heard from the victim's stepfather that this woman brought multiple men into the house. The Defendant said this woman dressed "slutty as hell," and the victim began acting and dressing like her. When Capt. Cook mentioned that the victim was "developed" for a twelve-year-old, the Defendant agreed and recalled the victim flirting with an older man, who appeared to believe that the victim was "of age." The Defendant reemphasized that the "point of the matter" was the victim was trying to flirt with the man knowing he was older. The Defendant said the victim would try to kiss the Defendant when she hugged him, but he would only give her a kiss on the cheek "as a friend." When asked why he believed the victim and her family moved out, he said he thought the victim's stepfather had gotten a job. The victim's stepfather had asked the Defendant for money for gas recently, and while the two spoke, the victim's stepfather mentioned the victim was cutting herself.

The Defendant said he was nervous about the accusations and stated, "Like I told you about the polygraph test. I don't trust polygraph tests." At this time, defense counsel stated the Defendant was about to discuss certain topics on the recording that the parties had agreed to redact. The parties agreed to a curative instruction regarding the Defendant's comments about the polygraph test. The trial court informed the jury there would be no polygraph evidence admitted, polygraph evidence has been ruled unreliable, and to exclude any reference about the polygraph test from future deliberation. The video recording resumed playing for the jury.

The Defendant said he felt more comfortable that the conversation was being recorded so his words could not be "twisted." The Defendant said he "hope[d]" the victim could not identify any marks on his genital area. He showed Capt. Cook the basketball shorts he wore to bed and showed how they could slide up his legs while sitting. He did not know if that "account[ed] for anything."

The Defendant mentioned the victim making advances toward him when he was drinking. Due to stress, he might drink "past [his] limit" and would not remember whether "something" may have happened. Once, while sobering up, he recalled possibly seeing the victim without a shirt. The victim also wore short shorts that he would adjust sometimes.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

He did not have good hand coordination when drinking, so if he had adjusted her shorts while drinking, "maybe something happened" or the victim thought she was being inappropriately touched.

Capt. Cook told the Defendant he believed "something" happened and acknowledged that the Defendant might have been under the influence when the victim made advances toward him. The Defendant "really hope[d]" he and the victim did not have sex because, if they did, it would make him sick. The Defendant recalled a time when the victim was trying to get the Defendant to kiss her, and she was rubbing her chest in his face. The Defendant said, "I think it did happen," because he remembered that he became short of breath, which "scar[ed]" him. He said, even being drunk, he could tell something was happening. The victim had later told him it was "ok" because she did not tell her parents "anything."

When Capt. Cook said the victim reported her and the Defendant's having sex eleven times, the Defendant expressed shock and said, "I know for a fact it didn't happen eleven times," just five or six. Capt. Cook attempted to clarify the Defendant's admission that he had sex with the victim, and the Defendant said, "I believe we did." He denied forcing the victim to have sex or pinning her down, and from what he could remember, the victim had made advances toward him. When asked to describe these advances, the Defendant said the victim would try to get the Defendant to kiss her and to massage her chest. He had told her he would only give her a backrub. When she made advances, the Defendant would locate her stepfather because she would not behave like that around her stepfather. The Defendant said his kids would either be in bed or on the couch when the victim would get on top of him with her shirt off. He affirmed anytime something like this happened, it was in the Defendant's house and the victim's parents were home.

The Defendant said he did not keep any condoms because he was not dating, and when asked if he was concerned with the victim's becoming pregnant, he responded he was scared the victim was "trying to get [him] to do it to begin with." He said he had been previously tested when Capt. Cook asked whether the victim needed to get tested for sexually transmitted infections. The Defendant then stated that he did not think "any of that happened" but that, at the same time, he "see[s] bits and pieces of that." At the conclusion of the recording, the Defendant said he was "exhausted."

During the interview, the Defendant appeared calm. His young daughter was playing near him and Capt. Cook, and the Defendant would often pick her up and play with her. The Defendant told Capt. Cook that he was glad Capt. Cook was doing his job and that, while he did not trust law enforcement, Capt. Cook seemed like a great guy. Capt.

Cook was polite toward the Defendant and maintained a respectful tone throughout the interview.

Jill Howlett, a social worker at Our Kids Center ("Our Kids") and an expert in the field of child abuse, interviewed the victim in November 2020. During this interview, the victim referred to her genital area as her "girl part." The victim reported that the Defendant had touched her on her "girl part" and bottom. She said the Defendant's fingers had "went inside [her] girl part" more than once, and "his part went inside of [her] girl part a bunch of times." When asked if anything ever came out of "his part" following the sexual conduct, the victim responded, "No, but it sort of felt like something was inside me." The victim further disclosed that the Defendant had attempted to make her touch "his part" with her hand and mouth, but she had refused. The victim then spontaneously stated to Ms. Howlett, "I didn't want him to do the other stuff either, but I couldn't push him off me." The victim further disclosed that she had been self-harming and explained that she had "cut[]" herself within the past year. Ms. Howlett affirmed it was uncommon for children to immediately report sexual abuse.

Doctor Lori Littrell, a nurse practitioner at Our Kids and an expert in the field of pediatric forensic medical examinations, performed a physical exam on the victim on November 3, 2020. She reported that nothing unusual was found during the exam, which she explained was to be expected considering the amount of time that had passed since the victim's last reported incident of abuse.

The State rested, and the trial court dismissed counts 1 through 4 on the State's motion. While the trial transcript does not include the State's recitation of its election of offenses as to the remaining counts or either party's closing arguments, the record does include a written copy of the State's election. The State elected as follows:

> Count 5 of the indictment, on a charge of rape of a child, the alleged penile penetration by the [D]efendant of the vaginal opening of [the victim] occurred during the event of helping with laundry between the dates of March 1, 2020, and July 10, 2020.

> Count 6 of the indictment, on a charge of rape of a child, the alleged penile penetration by the [D]efendant of the vaginal opening of [the victim] occurred during the event of watching a movie between the dates of March 1, 2020, and July 10, 2020.

Count 7 of the indictment, on a charge of rape of a child, the alleged digital penetration by the [D]efendant of the vaginal opening of [the victim] occurred during the event of helping with laundry between the dates of March 1, 2020, and July 10, 2020.

Count 8 of the indictment, on a charge of rape of a child, the alleged digital penetration by the [D]efendant of the vaginal opening of [the victim] occurred during the event of watching a movie between the dates of March 1, 2020, and July 10, 2020.

The Defendant did not present proof. The jury convicted the Defendant of rape of a child as charged in counts 5 through 8.

At the sentencing hearing on September 15, 2022, the State entered as an exhibit the Defendant's presentence report, which included the Defendant's STRONG-R assessment. Jonathan Williams of the Tennessee Department of Probation and Parole testified that he had prepared the report and affirmed that, while the Defendant had six misdemeanor charges, he had only four misdemeanor convictions, which included one theft, two criminal trespasses, and one domestic assault. The presentence report additionally reflected the Defendant had a revocation of a diversion for the domestic assault conviction, along with two subsequent violations of probation.

Dean Baxter testified on behalf of the Defendant. He mentioned the Defendant's "tragic" childhood, noting that the Defendant's mother was a prostitute, and that the Defendant was molested as a child. Mr. Baxter stated that although the Defendant had developed a drinking problem, he was still a good father to his children.

The State requested a sentence "in the middle" of the twenty-five-year and forty-year range and said it did not "see a situation where . . . consecutive sentencing should come into play." The trial court inquired whether Tennessee Code Annotated section 40-35-115(b)(5)—that the Defendant was convicted of two or more statutory offenses involving sexual abuse of a minor—was applicable regarding consecutive sentencing. The State acknowledged that it had overlooked that factor and that it was "directly on point." The defense acknowledged the trial court could apply Code section -115(b)(5) but requested it use its discretion, given the Defendant's "very tragic" upbringing.

The trial court found that the Defendant was to be sentenced as a Range II offender pursuant to the sentencing provision in the rape of a child statute. *See* Tenn. Code Ann. § 39-13-522(b)(2)(A). In determining the Defendant's sentence, the trial court stated that it

had considered the evidence presented, the presentence report, the principles of sentencing, the arguments made for sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on mitigating and enhancement factors, any statistical information provided by the Administrative Office of the Courts ("AOC") regarding sentencing, and the statements that were made at the sentencing hearing as well as at trial, and the Defendant's potential for rehabilitation.

Addressing the enhancement factors, the trial court found that the Defendant had a previous history of criminal convictions and criminal behavior in addition to those necessary to establish the appropriate range, noting that the Defendant had four misdemeanor convictions. *See* Tenn. Code Ann. § 40-35-114(1). The court gave this factor "some weight." The court found that the Defendant had previously failed to comply with the conditions of a sentence involving release into the community, explaining that the Defendant had violated the terms and conditions of release at least twice when placed on probation. *See id*. § -114(8). Though not an enhancement factor argued by the State, the court further found that the Defendant abused a position of private trust which significantly facilitated the commission of the offense. *See id.* § -114(14). In support of this factor, the court reasoned that the Defendant established a relationship with the victim while the two lived together, directed her to help him with chores, like the laundry, developed her and her parents' trust, and got her to watch movies with him. He then leveraged this trust to commit these acts. The court gave this factor "tremendous weight."

Regarding mitigation, the trial court considered that the Defendant himself was abused as a child, but it gave this factor "little weight." *See* Tenn. Code Ann. § 40-35-113(13). The court noted that "whatever little weight could be applied to the mitigating factors, it's not enough to offset the enhancement factors."

As to consecutive sentencing, the court found Tennessee Code Annotation section 40-35-115(b)(5) applied. It explained that the victim described the sexual abuse, including digital and penile penetration, happening multiple times between March 1, 2020, through July 10, 2020. While living with the victim, the Defendant had "some" control over her care and required her to help with chores, like laundry. While abusing this private trust, the Defendant threatened to get the victim in trouble if she disclosed the abuse. As a result, the victim felt worthless and would cut and starve herself.

The trial court sentenced the Defendant to thirty years at 100 percent for each conviction and ran counts 6 and 8 consecutively to counts 5 and 7, for a total effective sentence of sixty years. It noted that, pursuant to Tennessee Code Annotated section

39-13-524, the Defendant would be placed on community supervision for life. The trial court stated it believed that the total sentence reasonably related to the severity of the offenses and that the aggregate sentence was "necessary to accomplish the ends of justice."

Thereafter, the Defendant filed a motion for new trial alleging that (1) the trial court erred by denying the Defendant's motion to suppress his statements made to law enforcement; (2) the evidence was insufficient to support his convictions; (3) the trial court erred by not granting the Defendant's motion for acquittal; and (4) his sentence was excessive. After a hearing on December 9, 2022, the trial court denied the motion. This timely appeal followed.

## II.     ANALYSIS

### A.     Motion to Suppress

The Defendant contends that the trial court erred by denying his motion to suppress the statements he made to Capt. Cook. He argues these statements were involuntary because he was tired, the interview lasted "hours," and Capt. Cook was threatening and deceitful. The State argues the Defendant has waived the issue because he failed to include the transcript of the motion to suppress hearing in the record. We agree with the State.

Whether a confession was voluntary is a question of fact that the State bears the burden of proving by a preponderance of the evidence. *State v. Sanders*, 452 S.W.3d 300, 305 (Tenn. 2014) (citations omitted). "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The trial court's application of law to the facts is reviewed de novo with no presumption of correctness. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012) (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)).

Here, while the trial court's detailed order denying the motion to suppress is included in the appellate record, neither the transcript of the hearing nor the full recording of Capt. Cook's interview with the Defendant is included. Without this evidence, appellate review of the trial court's actions is frustrated, particularly given that the trial court noted in its order that it had "examined the entirety of the body camera video" admitted at the motion hearing. It is the Defendant's burden to prepare an adequate record for review. *See State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); Tenn. R. App. P. 24(b). As such, this court is precluded from reviewing the issue and must presume that the trial court's ruling was correct. *See State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) (stating that "[i]n the absence of an adequate record on appeal, this court must presume that the trial

court's rulings were supported by sufficient evidence") (citation omitted); *State v. Griffith*, 649 S.W.2d 9, 10 (Tenn. Crim. App. 1982) (holding that the failure to include the transcript of the suppression hearing prevents review on the merits). The Defendant is not entitled to relief.

### B.     Election of Offenses

The Defendant argues the State's election of offenses was insufficient to provide a unanimous jury verdict. While the Defendant acknowledges that the State provided an election and that the jury was provided instructions regarding a unanimous verdict, he contends the victim's testimony that "the same thing" happened "over and over and over again" rendered the election insufficient, as it did not adequately identify distinct conduct as to protect the Defendant's right to a unanimous jury verdict. The State responds that the Defendant has waived this issue and is not entitled to plain error relief. We agree with the State.

A party is not entitled to relief when it failed to take whatever action was reasonably available to prevent or nullify a harmful effect of an error. Tenn. R. App. R. 36(a). A defendant waives plenary review of the State's election of offenses when he fails to raise the issue at trial or in his motion for new trial. *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016); Tenn. R. App. P. 3(e). Here, while the record includes a written copy of the election of offenses, the trial transcript does not include the State's submission of its election to the jury or any discussion with the trial court regarding the election. *See Bunch*, 646 S.W.2d at 160 (explaining it is the defendant's burden to prepare an adequate record for review); Tenn. R. App. P. 24(b). As such, the record does not reflect that the Defendant raised a contemporaneous objection to the election. *See State v. Harris*, No. M2018-01680-CCA-R3-CD, 2019 WL 5704185, at *8 (Tenn. Crim. App. Nov. 5, 2019) (denying plenary review where the defendant failed to object to the State's election). Further, the Defendant did not raise the issue in his motion for new trial. *Smith*, 492 S.W.3d at 232; Tenn. R. App. P. 3(e). The issue is waived.

Despite the waiver, the Defendant states in his brief that election issues are subject to plain error review. However, the Defendant did not argue for the application of the plain error factors, nor did he respond in a reply brief to the State's plain error argument. A defendant has the burden of persuading the appellate court that plain error exists. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007). "[A] party seeking plain error relief must generally raise and argue the issue in the party's briefing, just as the party would do with all other issues in the ordinary course of an appeal." *State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *3 (Tenn. Crim. App. Oct. 30, 2023) (citing Tenn. R.

- 11 -

App. P. 27(a)), *no perm. app. filed*. "Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our *sua sponte* consideration of plain error relief." *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 Wl 4552193, at *5 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed*. Such circumstances do not exist here. The Defendant is not entitled to relief.

## C.      Sufficiency of the Evidence

The Defendant argues the evidence is insufficient to support his four convictions for rape of a child. He broadly contends that the evidence is not sufficient because no physical evidence or eyewitnesses were presented at trial and the victim was not credible because she waited "months" to report the abuse, reported it only after the Defendant refused to give her family money, and had previously made other "unfounded" allegations. He further alleges the investigation was limited and no other suspects were investigated. The State responds that the evidence is sufficient, arguing the Defendant merely requests this court reweigh the evidence and credibility of the witnesses. We agree with the State.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The law provides this deference to the jury's verdict because

[t]he jury and the [t]rial [j]udge saw the witnesses face to face, heard them testify, and observed their demeanor on the stand, and were in much better position than we are, to determine the weight to be given their testimony. The human atmosphere of the trial and the totality of the evidence before the court below cannot be reproduced in an appellate court, which sees only the written record.

*Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963) (internal quotations and citations omitted). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

Here, the victim testified that while helping the Defendant with his laundry and then while watching a movie with him, the Defendant digitally penetrated her vagina and then penetrated her vagina with his penis. Both incidents happened shortly after her twelfth birthday. The victim's testimony alone sufficiently supports the Defendant's convictions. *State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that 'the testimony of a victim, by itself, is sufficient to support a conviction.'") (quoting *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)). The victim reported the abuse to her parents, Mr. Brown, Mr. Sullivan, and Capt. Cook, and she consistently identified the Defendant as the perpetrator. Her testimony is further supported by the Defendant's own statements to law enforcement that he believed he and the victim had sex five or six times. Although the Defendant questions the timing of the victim's disclosures, and contends the victim had reasons to lie and had lied about similar allegations previously, the jury credited her version of events, as was its province. *See Bland*, 958 S.W.2d at 659. As it is beyond our purview to reweigh the credibility of the witnesses, we conclude that in the light most favorable to the State, the evidence is sufficient to support the Defendant's convictions. *Bland*, 958 S.W.2d at 659 (citing *Cabbage*, 571 S.W.2d at 835).

## D.     Sentencing

The Defendant alleges his sentence of sixty years to serve at 100 percent is excessive. He argues the sentence was improper, given that it was based entirely on circumstantial evidence, it was not the least severe measure to protect society, and it was disparate compared to other offenders' sentences for rape of a child as evidenced in the statistical information provided by the AOC. Additionally, he contends it was improper for the trial court to sua sponte consider and apply enhancement factor (14) in determining

the length and manner of his sentence and Tennessee Code Annotated section 40-35-115(b)(5) to support imposing a consecutive sentence. He further notes the trial court failed to make the additional *Wilkerson* factors supporting his consecutive sentence. The State responds that the trial court acted within its broad discretion in its sentencing decision. We agree with the State.

## 1. Length and Manner of Service

When an accused challenges the length of a sentence or manner of service, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the *Bise* standard to "questions related to probation or any other alternative sentence"). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). *See id.* at 344. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

The Sentencing Reform Act was enacted in order "to promote justice" and "assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions." *Id.* § -102. In determining the proper sentence, the trial court must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered

by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by AOC as to Tennessee sentencing practices for similar offenses; (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *Id.* § -210(b).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210(d)-(f); *Carter*, 254 S.W.3d at 342-43. Moreover, misapplication of an enhancement or mitigating factor no longer "invalidate[s] the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Accordingly, this court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

Here, the Defendant was convicted of four counts of rape of a child, a Class A felony. Tenn. Code Ann. § 39-13-522(b)(1). Pursuant to Code section 39-13-522(2)(A), the Defendant was a Range II offender and, as such, the appropriate sentencing range was twenty-five to forty years. *Id.* § 40-35-112(b)(1). The trial court imposed a thirty-year sentence for each of the Defendant's rape of a child convictions, five years above the minimum sentence. We note that defendants are no longer entitled to the minimum sentence in a range, as trial courts have the discretion "to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Carter*, 254 S.W.3d at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). The weighing of enhancement and mitigating factors is left to the sound discretion of the trial court, and the application of a single enhancement factor supports an enhanced sentence. *State v. Dotson*, 450 S.W.3d 1, 103 (Tenn. 2014) (citing *Carter*, 254 S.W.3d at 345); *State v. Banks*, No. M2019-00017-CCA-R3-CD, 2020 WL 5015888, at *10 (Tenn. Crim. App. Aug. 25, 2020) (citing *State v. Bolling*, 75 S.W.3d 418, 421 (Tenn. Crim. App. 2001)).

Supporting its decision to enhance the Defendant's sentence, the trial court applied: enhancement factor (1)—the Defendant had a previous criminal history in addition to that necessary to establish the range; enhancement factor (8)—the Defendant had previously failed to comply with conditions of release; and enhancement factor (14)—the Defendant abused a position of private trust. The presentence report reflected the Defendant had four

prior misdemeanor convictions and had previously violated his conditions of probation, supporting the application of enhancement factors (1) and (8). Moreover, the record supports the application of factor (14), as a trial court is not limited in considering only those enhancement factors presented by the State. *See State v. Hatmaker*, No. E2017-01370-CCA-R3-CD, 2018 WL 2938395, at *7 (Tenn. Crim. App. June 8, 2018) (quoting *State v. Jones*, No. W2013-00335-CCA-R3-CD, 2014 WL 3002808, at *17 (Tenn. Crim. App. Jan. 29, 2014) (holding a trial court is not bound to only consider enhancement factors recommended by the State and may, sua sponte, consider applicable factors in its sentencing decision). The record reflects that the victim resided in the Defendant's home for four months, her stepfather and the Defendant were best friends, the victim often helped the Defendant with chores around the house, the two watched movies together while home, and that, in the Defendant's interview with Capt. Cook, he stated the victim saw the Defendant as a father figure. *See State v. Gutierrez*, 5 S.W.3d 641, 645 (Tenn. 1999) (noting that an adult occupies a position of presumptive private trust with respect to a minor when the adult and child are members of the same household). Through this position of trust, the Defendant gained access to the victim and, while in "some" control of her care, perpetrated multiple sexual crimes against her. *See State v. Kissinger*, 922 S.W.2d 482, 488-89 (Tenn. 1996) (finding the defendant occupied a position of trust by being friends with the victims' mother, residing with the victims, and being entrusted with the victims' care). Additionally, the trial court noted that, regardless of any mitigating factors, it was not enough to offset the enhancement factors.

Citing the statistical information provided by the AOC, the Defendant also contends that his sentences are "unjustifiably disparate" because he was "sentenced above the median for both standard offenders and 'all offenders' convicted of Rape of a Child." The trial court stated that it had considered the AOC statistical information in rendering its ruling, and the Defendant does not contend otherwise. As noted above, this court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Though the trial court is statutorily mandated to consider this statistical information, the weight to be afforded it lies within its discretionary function.

The trial court addressed on the record the principles and purpose of our Sentencing Act. The trial court imposed a statutorily permissive sentence, and the Defendant has failed to overcome the presumption of reasonableness afforded the trial court's sentencing decision. Accordingly, we conclude that the trial court acted within its discretion in imposing the length of the Defendant's sentences.

## 2.     Consecutive Sentencing

A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the categories in Tennessee Code Annotated section 40-35-115(b).  "Any one of these grounds is a sufficient basis for the imposition of consecutive sentences."  *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)).  This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the . . . grounds listed in Tennessee Code Annotated section 40-35-115(b)."  *Id.* at 861.  "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal."  *Id.* at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).  When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed."  Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

Here, the Defendant argues the trial court erred by imposing a consecutive sentence.  First, we note that contrary to the Defendant's contention that the trial court erred by sua sponte considering consecutive sentencing, the "consecutive sentencing statute places responsibility for determining the propriety of consecutive sentencing on the trial court, not the parties."  *State v. Skelton*, No. M2004-02203-CCA-R3CD, 2006 WL 2738879, at *10 (Tenn. Crim. App. Sept. 21, 2006) (citations omitted).  Additionally, while the Defendant cites to the required *Wilkerson* factors a trial court must find when imposing consecutive sentencing based on the dangerous offender criterion, *see State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the Defendant's consecutive sentence, in the instant case, is based on his being convicted of two or more statutory offenses involving sexual abuse of a minor with aggravating circumstances.  *See* Tenn. Code Ann. § 40-35-115(b)(5).  As such, the additional *Wilkerson* findings are not required.

Turning to the trial court's application of Tennessee Code Annotated section 40-35-115(b)(5), the statute provides a trial court may impose consecutive sentences when a "defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim . . . , the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and

mental damage to the victim[.]" In this case, the trial court found the Defendant was convicted of four separate acts of rape of a child against the twelve-year-old victim.

As to the aggravating circumstances, the trial court considered the Defendant's and victim's relationship and found the two lived in the same house, the Defendant had "some" control over the victim's care, she helped with chores, and the two watched movies together. The Defendant then used this position of private trust to accomplish the sexual acts against the victim and threatened to get her in trouble if she disclosed the abuse. *See State v. Murphy*, No. W2022-01682-CCA-R3-CD, 2023 WL 5976829, at \*4-5 (Tenn. Crim. App. Sept. 14, 2023), *perm. app. denied* (Tenn. Feb. 13, 2024) (affirming application of a consecutive sentence pursuant to Tennessee Code Annotated section 40-35-115(b)(5), in part, based on the defendant's gaining access to the minor victim by his close relationship with her family and the two having resided in the same household). Regarding the time span of the undetected sexual activity, the court noted the abuse occurred multiple times between March 1, 2020, through July 10, 2020. *See State v. Miller*, No. M2004-00707-CCA-R3-CD, 2005 WL 1220236, at \*7 (Tenn. Crim. App. May 20, 2005) (affirming consecutive sentencing, in part, for sexual abuse perpetrated against a minor over a period of three months). As to the nature and scope of the sexual acts, the trial court found that the victim suffered both digital and penile penetration. *See State v. Mason*, No. E2019-00174-CCA-R3-CD, 2020 WL 5015903, at \*35 (Tenn. Crim. App. Aug. 25, 2020) (affirming the imposition of consecutive sentences, in part, based on the sexual abuse of a minor that "involved multiple types of sexual penetration"). The trial court additionally accredited the victim's testimony of feeling "worthless" and cutting and starving herself as a result of the Defendant's sexual abuse. *See State v. Pruitt*, No. E2021-01118-CCA-R3-CD, 2022 WL 4005810, at \*6 (Tenn. Crim. App. Sept. 2, 2022) (concluding the "residual and mental damage" suffered by the victim as a result of the abuse supported the imposition of consecutive sentences under Code section 40-35-115(b)(5)), *perm. app. denied* (Tenn. Jan. 11, 2023).

The Defendant notes that he will be over ninety years old when released from prison and contends that his effective sentence is not the "least severe measure" to protect society. However, after imposing the Defendant's sentence, the trial court determined the total sentence reasonably related to the severity of the offenses and that the aggregate sentence was "necessary to accomplish the ends of justice." The record indicates that the trial court considered the requisite factors and the testimony at trial and the sentencing hearing, thus supporting the imposition of consecutive sentences.

The Defendant also submits that his total sentence results in "an effective life-without parole sentence[,]" which is "not justly deserved given the facts and

- 18 -

circumstances of the offense[,] specifically that the entire case [was] based on circumstantial evidence." We note that the victim's testimony is direct evidence. Moreover, it is well-settled law in Tennessee that a criminal offense may be established exclusively by circumstantial evidence. *See State v. Keen*, 31 S.W.3d 196, 218 (Tenn. 2000); *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). As discussed above, the evidence in this case was sufficient to support the Defendant's convictions. The Defendant provides no authority, and we know of none, that provides that a conviction based solely on circumstantial evidence must receive a lesser sentence. In any event, the Defendant's convictions were based primarily on direct evidence, which included the testimony of the victim and the Defendant's confessing to having sex with the victim.

For these reasons, we conclude that the trial court acted within its discretion when sentencing the Defendant to consecutive terms. The Defendant is not entitled to relief from his overall sentence.

### E. Cumulative Error

The Defendant argues that the multiple "procedural errors and constitutional violations" in the trial court violated his due process right to a fair trial and, as such, he is entitled to relief under the cumulative error doctrine. In this regard, he alleges that the jury heard statements during the Defendant's interview with Capt. Cook regarding the Defendant's willingness to undergo a polygraph test. He argues the parties had agreed these statements were inadmissible and, even with the trial court's curative instructions, their inclusion violated his due process rights and negatively impacted the outcome of his case.

Next, the Defendant asserts the State's "repeated[]" use of leading questions on the victim's direct examination after multiple objections from the defense violated the "Rules of Evidence" and amounted to a denial of a fair trial. He further reiterates his contention that the trial court's "impartial[]" sua sponte application of enhancement factor (14) and Tennessee Code Annotated section 40-35-115(b)(5) during sentencing deprived him of due process. Finally, he contends the State presented "rubber stamp" experts who merely provided impressive resumes but offered no additional evidence beyond the victim's statements nor conducted any further investigation as to whether a rape occurred. The State responds that no such errors exist to warrant such relief and that, in any regard, the Defendant has waived this issue.

The cumulative error doctrine applies when there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error,

but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To that end, more than one actual error in the trial court proceedings must exist before the cumulative error doctrine can apply. *Id*. at 77. The failure to raise cumulative error in the motion for new trial waives the issue on appeal. *See State v. Davis*, 141 S.W.3d 600, 632 (Tenn. 2004).

Here, the Defendant has waived review pursuant to the cumulative error doctrine as he failed to raise this argument in his motion for new trial. *See Davis*, 141 S.W.3d at 632; Tenn. R. App. R. 3(e), 36(a). As the individual issues supporting this claim were also not included in his motion for new trial, other than his sentencing contention which we addressed above, they are likewise waived. Tenn. R. App. R. 3(e), 36(a). Notwithstanding waiver for the above-mentioned reasons, we further note the deficiencies in the Defendant's brief. While he made general assertions against the State's and trial court's actions, he failed to state with specificity how each of these alleged errors violated his due process rights and provided no legal authority supporting these specific contentions. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). As such, the Defendant is additionally not entitled to relief for this reason.

### III.    CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
KYLE A. HIXSON, JUDGE
